SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Crisoforo Montalvo (A-76-15) (077331)**

**Argued February 28, 2017 -- Decided June 8, 2017**

**FERNANDEZ-VINA, J., writing for the Court.**

This appeal concerns whether an individual may lawfully possess and hold a weapon for self-defense in his home while answering the front door.

Defendant Crisoforo Montalvo and his wife lived directly above Arturs Daleckis and his wife. On the night of March 24, 2012, Daleckis grew agitated by noise emanating from Montalvo's unit; he stood on his bed and knocked on the ceiling three or four times. Montalvo then proceeded downstairs and knocked on Daleckis's door. Montalvo picked up a small table belonging to Daleckis and threw it off the front porch, breaking it.

After Montalvo returned to his unit, Daleckis knocked on the door. Montalvo and his wife testified that they heard knocking, kicking, and slamming on the door. Montalvo testified that he became scared for himself, his wife, and their unborn child. As a precautionary measure, Montalvo retrieved a machete from a closet as he moved to answer the door. Daleckis testified that Montalvo pointed the machete at him. Montalvo testified that he kept the machete in his hand, behind his leg, and below his waist while speaking with Daleckis.

Daleckis testified that he asked Montalvo why he opened the door with a machete in his hand and Montalvo responded, "I don't care." Daleckis then stated he was going to call the police and Montalvo again replied, "I don't care." Following this exchange, both men returned to their apartments. Daleckis telephoned 911. Daleckis testified that he then heard yelling, followed by the sound of "banging . . . cutting . . . [or] chopping" of metal and the next morning saw what appeared to be two machete marks on the shared porch. Montalvo testified that after he and Daleckis finished talking, he immediately walked back up his stairs and handed the machete to his wife, who placed the machete back in the closet while Montalvo waited outside on the porch for the police to arrive.

One day after the incident, the State charged Montalvo with the disorderly persons offense of criminal mischief. The complaint-warrant specified that Montalvo was charged with breaking Daleckis's furniture. In June 2012, a grand jury indicted Montalvo for third-degree possession of a weapon for an unlawful purpose (Count One), and fourth-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(d) (Count Two).

Montalvo was tried before a jury. When the trial judge charged the jury, he first provided the instructions for Count Two. The judge primarily relied upon the Model Jury Charge for N.J.S.A. 2C:39-5(d). The judge did not add a self-defense instruction to the model charge for Count Two. The judge then instructed the jury on Count One, the unlawful-purpose charge, and included a self-defense instruction with respect to that charge.

During deliberations, the jury sent the trial judge a note asking, "Second charge, unlawful possession of a weapon, is self[-]defense considered a lawful use?" The judge and counsel for both sides discussed the appropriate response to the jury's inquiry on the record. During this colloquy, the trial judge decided to answer the jury's question by reading a section of State v. Kelly, 118 N.J. 370 (1990), and stated in part that "it would appear that the availability of necessity as a justification for the immediate possession of a weapon, as with self[-]defense, is limited only to cases of spontaneous and compelling danger." Minutes later, the jury found Montalvo not guilty of Count One and guilty of Count Two. The trial judge found Montalvo guilty of the disorderly persons offense.

The Appellate Division affirmed Montalvo's conviction and sentence. The panel addressed Montalvo's Second Amendment claim and held that it was meritless because the surrounding circumstances and the machete's status as an uncommon item sufficiently supported the jury's verdict. The panel concluded that the jury instructions properly relied upon Kelly. The Court granted Montalvo's petition for certification. 226 N.J. 212 (2016).

1

**HELD**: The right to possess a weapon in one's own home for self-defense would be of little effect if one were required to keep the weapon out-of-hand, picking it up only "spontaneously." Defendant had a constitutional right to possess the machete in his home for his own defense and that of his pregnant wife. Because the trial court's instructions did not convey this principle, the instructions were erroneous. Further, because the erroneous instructions were capable of producing an unjust result in this matter, they constitute plain error.

1. N.J.S.A. 2C:39-5(d) states that "[a]ny person who knowingly has in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have is guilty of a crime of the fourth degree." The purpose of Section 5(d) is to protect citizens from the threat of harm while permitting the use of objects such as knives in a manner consistent with a free and civilized society. (pp 16-19)

2. Self-defense is a potential defense to a possessory weapons offense. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." District of Columbia v. Heller, 554 U.S. 570, 592 (2008). In State v. Harmon, the Court held that self-defense does not excuse the possession of a weapon under N.J.S.A. 2C:39-5(d) except "in those rare and momentary circumstances where an individual arms himself spontaneously to meet an immediate danger." 104 N.J. 189, 208-09 (1986). In Kelly, the Court found that no self-defense instruction was warranted in the absence of such spontaneous action during a street encounter. (pp. 19-21)

3. The home is accorded special treatment within the justification of self-defense. In Heller, supra, the United States Supreme Court emphasized the right to possess weapons in the home, "where the need for defense of self, family, and property is most acute." 554 U.S. at 628. (pp. 21-23)

4. When a party does not object to a jury instruction, this Court reviews the instruction for plain error. Plain error refers to any error "clearly capable of producing an unjust result." R. 2:10-2. (pp 23-24)

5. In response to the jury's question, the court relied on language it found in Kelly, in which self-defense was raised in connection with Section 5(d). However, Kelly is not applicable to Montalvo's situation. The Court applied the spontaneity requirement in Kelly because the only scenario in which the defendant's use could constitute lawful self-defense would be if she had a manifestly lawful purpose to carry the razor, then suddenly and spontaneously used it as a weapon to repel immediate harm. Montalvo legally possessed a machete in his home. The Second Amendment protects the right of individuals to possess weapons, including machetes, in the home for self-defense purposes. Because the instructions did not convey this principle, the instructions were erroneous. (pp. 24-26)

6. If the jurors believed Montalvo's version of events, he never left his apartment with the machete, never used it against person or property, and never raised it toward Daleckis. Such possession is protected by the Second Amendment and is consistent with New Jersey's statutory scheme and caselaw. The record does not provide the information needed to determine which version of events the jury relied upon to convict Montalvo under N.J.S.A. 2C:39-5(d), and the Court will not speculate about the foundations of the jury verdict. Here, because the jury instructions permitted the jurors to convict Montalvo either upon a valid theory of guilt—threatening Daleckis with the machete unprovoked or taking the machete outside and damaging the porch—or upon an invalid theory—holding the machete when answering the door—the jury instructions were clearly capable of producing an unjust result. (pp 27-29)

7. The Court directs the Committee on Model Criminal Jury Charges to review and revise the charge for N.J.S.A. 2C:39-5(d). A modified jury instruction is necessary to clarify that possession of a lawful weapon in one's home cannot form the basis of a conviction under N.J.S.A. 2C:39-5(d). Therefore, we direct the Committee to refashion the charge consistent with this opinion. The Court suggests language for the Committee's consideration in refashioning the charge and notes that that the spontaneity requirement of Kelly is not applicable to possession of a legal weapon in the home for self-defense purposes. (pp. 29-31)

The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** for further proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

CRISOFORO MONTALVO,

    Defendant-Appellant.


       Argued February 28, 2017 – Decided June 8, 2017

       On certification to the Superior Court, Appellate Division.

       Lauren S. Michaels, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Lauren S. Michaels and Al Glimis, Assistant Deputy Public Defenders, on the briefs).

       Ian D. Brater, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Mary R. Juliano, Special Deputy Attorney General/Acting Assistant Prosecutor and Paul H. Heinzel, Assistant Prosecutor, on the briefs).

       Emily R. Anderson, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Christopher S. Porrino, Attorney General, attorney).


       JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

       This appeal concerns whether an individual may lawfully possess and hold a weapon for self-defense in his home while

answering the front door. Specifically, this Court is called upon to determine whether an individual is criminally liable for unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), if he does not arm himself spontaneously to greet an imminent danger.

In 2012, defendant Crisoforo Montalvo engaged in a confrontation with his downstairs neighbor Arturs Daleckis. Following an argument about noise, Montalvo broke a small outdoor table belonging to Daleckis. Daleckis knocked on Montalvo's front door. Fearing reprisal for the damage to the table, Montalvo answered the door with a machete in his hand. According to Montalvo, he never raised the machete at Daleckis and never exited his apartment with it. Daleckis, however, claimed that Montalvo pointed the machete at him and later used it to damage their shared porch.

As a result of this altercation, the State charged Montalvo with unlawful possession of a weapon, N.J.S.A. 2C:39-5(d), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). Regarding the unlawful possession charge, the trial judge instructed the jury that self-defense does not justify possession under N.J.S.A. 2C:39-5(d) unless the defendant arms himself spontaneously to repel an immediate threat. The judge provided a standard self-defense instruction for the unlawful purpose charge.

2

The jury convicted Montalvo of unlawful possession of a weapon and acquitted him of possession of a weapon for an unlawful purpose. Montalvo appealed, arguing that the conviction violated his Second Amendment right to bear arms and that the jury instructions were erroneous. The Appellate Division affirmed. We reverse because the jury instructions constitute plain error.

I.

A.

The following facts are gleaned from the testimony at defendant's trial. This matter stems from a dispute between two neighbors in the late night hours of March 24, 2012. Defendant Crisoforo Montalvo and his wife Orbilit Reyes-Avilas formerly resided in a second-floor apartment in Bradley Beach (Apartment 2). The door to Apartment 2 is located on an elevated front porch of the property. The front door opens to a stairwell leading to the living room of Apartment 2. Next to Apartment 2's front door is the door for the first-floor unit (Apartment 1).

Arturs Daleckis and his wife occupied Apartment 1 during the time in question. The tenants shared the elevated porch with two other units. According to Daleckis, the ceiling separating Apartment 1 and Apartment 2 provided poor insulation from sound.

3

Montalvo and Reyes-Avilas lived directly above Daleckis and his wife for approximately two years prior to the incident in question. Montalvo and Reyes-Avilas testified that Daleckis frequently threw loud parties during their occupancy. Daleckis testified that he also experienced noise issues with Montalvo and spoke with him when the noise grew too loud.

On the night of March 24, 2012, Daleckis grew agitated by noise emanating from Apartment 2. According to Daleckis, the noise included banging and what sounded like fighting or "violent exchanges." Montalvo and Reyes-Avilas disputed this characterization and testified that they were merely talking, laughing, and watching television in their apartment. Reyes-Avilas was approximately seven months pregnant at the time.

In response to the noise emanating from Apartment 2, Daleckis stood on his bed and knocked on the ceiling three or four times. Daleckis characterized his knocking as gentle. In contrast, Montalvo testified that the knocking shook the entire living room and caused him and Reyes-Avilas to become nervous. Montalvo then proceeded downstairs and knocked on Daleckis's door. According to Montalvo, he did not receive an answer. Daleckis claimed not to have heard any knocking at his door.

At this point, Montalvo picked up a small table belonging to Daleckis and threw it off the porch, breaking it. Daleckis

4

testified that he had purchased the table for approximately five dollars at a flea market.  Montalvo then returned to Apartment 2.

Shortly after Montalvo returned to his unit, Daleckis knocked on the door of Apartment 2.  Although Daleckis testified that he knocked on the door to resolve the situation peacefully, Montalvo and Reyes-Avilas testified that they heard knocking, kicking, and slamming on the door.  Montalvo testified that he became scared for himself, his wife, and their unborn child.  According to Montalvo, he was concerned that Daleckis might have a gun.

As a precautionary measure, Montalvo retrieved a machete from a closet as he moved to answer the door.  Montalvo had owned the machete for about four months and had recently begun utilizing it in his roofing job.  He kept it alongside various other tools in the closet.  Montalvo opened the door and faced Daleckis.

According to Montalvo, he held the machete down behind his leg so as not to scare Daleckis.  Montalvo stated that when he opened the door Daleckis said, "Why do you break my f---ing furniture?" and that he responded, "[B]ecause you make noise. . . . You banging on my ceiling and you turn my wife nervous."  Montalvo testified that Daleckis was yelling at him; Daleckis stated that he was speaking with "a little louder voice."

During this altercation, Daleckis was on the porch and Montalvo remained within the threshold of Apartment 2.

Daleckis testified that he did not see the machete initially but told Montalvo to "calm down." According to Daleckis, this statement prompted Montalvo to lower his arm, moving the machete so it was visible to Daleckis. Daleckis testified that Montalvo pointed the machete at him. He also testified to his realization that, prior to lowering his arm, Montalvo was holding the machete at an angle "like he was ready to chop."

In contrast, Montalvo testified that he kept the machete in his hand, behind his leg, and below his waist while speaking with Daleckis. When Daleckis made a physical gesture ("he did his move") toward him, he also made a physical gesture ("I did this move") and the machete became visible from behind Montalvo's leg. Reyes-Avilas testified that when this exchange took place she was at the top of the stairs, looking down at the front door, and witnessed Montalvo holding the machete downward.

Daleckis testified that he asked Montalvo why he opened the door with a machete in his hand and Montalvo responded, "I don't care." Daleckis then stated he was going to call the police and Montalvo again replied, "I don't care." Following this exchange, both men returned to their apartments.

Upon returning to Apartment 1, Daleckis telephoned 911. Daleckis told the 911 operator that Montalvo was "upstairs going crazy" and that "he opened the door with a huge knife in his hand." Daleckis informed the operator that Montalvo never stepped outside with the weapon.

Daleckis testified that he then heard yelling, followed by the sound of "banging . . . cutting . . . [or] chopping" of metal and the next morning saw what appeared to be two machete marks on the shared porch. In contrast, Montalvo testified that after he and Daleckis finished talking, he immediately walked back up his stairs and handed the machete to Reyes-Avilas. Reyes-Avilas placed the machete back in the closet while Montalvo waited outside on the porch for the police to arrive.

When the police arrived, Montalvo was standing on the porch. Montalvo raised his hands in the air and stated "I got nothing" as they approached. He told the police that he grabbed the machete because he was afraid for his and his wife's lives. The police handcuffed Montalvo and placed him in a patrol car. One officer observed a broken wooden item in front of the porch. When Reyes-Avilas spoke with the responding officers, she told them that she placed the machete back in the closet.

The officers retrieved the machete from the closet and arrested Montalvo. The next day, Daleckis refused to provide a

7

statement to the police because he did not want Montalvo to get in trouble.

B.

One day after the incident, the State charged Montalvo with the disorderly persons offense of criminal mischief, contrary to N.J.S.A. 2C:17-3(b)(2). The complaint-warrant specified that Montalvo was charged with breaking Daleckis's furniture. In June 2012, a Monmouth County grand jury indicted Montalvo for third-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(d) (Count One), and fourth-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(d) (Count Two).

The June indictment set forth both charges. Count One alleged that Montalvo possessed the machete "with a purpose to use it unlawfully against the person or property of [Daleckis]." Count Two alleged that Montalvo knowingly possessed the machete "under circumstances not manifestly appropriate for such lawful uses as it may have."

Montalvo was tried before a jury in July and August 2013. When the trial judge charged the jury, he first provided the instructions for Count Two, the unlawful possession charge. The judge primarily relied upon the Model Jury Charge for N.J.S.A. 2C:39-5(d). In relevant part, the Model Jury Charge provides:

8

In order to convict the defendant [under N.J.S.A. 2C:39-5(d)], the State must prove the following elements beyond a reasonable doubt

1.    That S - _____ is a weapon (or that there was a weapon);

2.    That the defendant possessed the weapon knowingly; and

3.    That the defendant's possession of the weapon was under circumstances not manifestly appropriate for a lawful use.

. . . .

The third element that the State must prove beyond a reasonable doubt is that the defendant possessed S - _____ . . . under circumstances not manifestly appropriate for such lawful uses as it may have.  It is not necessary for the State to prove that the defendant formed an intent to use S - _____ . . . as a weapon.

It is, however, necessary for the State to prove that it was possessed under such circumstances that a reasonable person would recognize that it was likely to be used as a weapon; in other words, under circumstances where it posed . . . a likely threat of harm to others [AND/OR] a likely threat of damage to property.  You may consider factors such as the surrounding circumstances; size, shape and condition of the object, the nature of its concealment, the time, place and actions of the defendant when it was found in his/her possession to determine whether or not the object was manifestly appropriate for its lawful use.

If the State has proven each element beyond a reasonable doubt, then you must find defendant guilty.  If, however, the State has failed to prove any element of the offense beyond a reasonable doubt, then you must find defendant not guilty.

[Model Jury Charges (Criminal), "Unlawful Possession of a Weapon (N.J.S.A. 2C:39-5(d))" (Apr. 18, 2005).]

The judge did not add a self-defense instruction to the model charge for Count Two.

The judge then instructed the jury on Count One, the unlawful-purpose charge, and included a self-defense instruction with respect to that charge. As to the self-defense instruction for Count One, the judge stated:

> I have already told you that the State must prove beyond a reasonable doubt that the defendant had an unlawful purpose at the time [in] question. If you find that the defendant had a lawful purpose, for example, to use the machete to protect himself and his pregnant wife or use it against the use of unlawful force or if you have a reasonable doubt as to the defendant's purpose, then the State has failed to carry its burden of proof on this element beyond a reasonable doubt.
>
> I instruct you that for the purpose of this offense, if the defendant honestly believed that he needed to use that machete to protect himself and his wife, the law does not require that this belief be reasonable. In other words, if the defendant had an honest, though unreasonable, belief that he needed to use the weapon to protect himself and his wife, this negates the purposeful mental state required for this particular offense.

During deliberations, the jury sent the trial judge a note asking, "Second charge, unlawful possession of a weapon, is self[-]defense considered a lawful use?" The judge and counsel for both sides discussed the appropriate response to the jury's

10

inquiry on the record. During this colloquy, the trial judge

decided to answer the jury's question by reading a section of

State v. Kelly, 118 N.J. 370 (1990). In response to the jury's

question, the court stated:

> Members of the jury, in response to your
> question, "Is self[-]defense considered a
> lawful use," I remind you that it is necessary
> for the State to prove that it, meaning the
> object[,] was possessed under such
> circumstances that a reasonable person would
> recognize that it was likely to be used as a
> weapon. In other words, under circumstances
> where it posed a likely threat of harm to
> others and/or a likely threat of damage to
> property, you may consider factors such as the
> surrounding circumstances as well as the size,
> shape, and condition of the object; the nature
> of its concealment; the time, place and
> actions of the defendant; when it was found in
> his possession to determine whether or not the
> object was manifestly appropriate for its
> lawful uses.
>
> This statute is 2C:39-5(d). Section 5(d)
> prohibits the possession of implements as
> weapons even if possessed for precautionary
> purposes, except in situations of immediate
> and imminent danger.
>
> Although self[-]defense involves a lawful use
> of a weapon, it does not justify the unlawful
> possession of the weapon under Section 5(d)
> except when a person uses a weapon after
> arming himself or herself spontaneously to
> repel an immediate danger.
>
> Obviously, there may be circumstances in which
> a weapon is seized in response to an immediate
> danger, but ensuing circumstances render its
> use unnecessary. Under such conditions, the
> individual may take immediate possession of
> the weapon out of necessity rather than self[-
> ]defense. However, it would appear that the

11

availability of necessity as a justification
for the immediate possession of a weapon, as
with self[-]defense, is limited only to cases
of spontaneous and compelling danger.  Please
resume your deliberations.

Minutes later, the jury found Montalvo not guilty of Count One, possession of a weapon for an unlawful purpose, and guilty of Count Two, unlawful possession of a weapon.  That same day, the trial judge found Montalvo guilty of the criminal mischief disorderly persons offense.

In October 2013, the trial court sentenced Montalvo to 540 days of imprisonment for Count Two.  The court also sentenced Montalvo to an eighteen-day jail term for the criminal mischief charge.  Because Montalvo remained incarcerated prior to sentencing, the court credited him with the 558 days already served.

Montalvo filed a timely appeal of his conviction for unlawful possession of a weapon.  Specifically, Montalvo asserted that his conviction criminalizes the possession of an otherwise legal weapon in his home in violation of the Second Amendment.  He also argued that the trial judge improperly instructed the jury concerning the applicability of self-defense to Count Two.

In an unpublished per curiam opinion, the Appellate Division affirmed Montalvo's conviction and sentence.  The panel addressed Montalvo's Second Amendment claim and held that it was

12

meritless because the surrounding circumstances and the machete's status as an uncommon item sufficiently supported the jury's verdict. As to Montalvo's second argument, the panel held that the jury instructions did not amount to plain error. The panel concluded that the jury instructions properly relied upon Kelly, which was the controlling case to address the jury's question.

We granted Montalvo's petition for certification. 226 N.J. 212 (2016).

## II.

Montalvo reiterates the contentions that he made before the Appellate Division and urges this Court to reverse his conviction. First, Montalvo argues that his defensive possession of the machete in his own home was manifestly appropriate under the circumstances. He further avers that his conviction for unlawful possession of a weapon criminalizes the defensive possession of an otherwise lawful weapon in the home in violation of the Second Amendment to the United States Constitution.

Second, Montalvo maintains that the trial judge's response to the jury's question as to whether self-defense constitutes a lawful use under N.J.S.A. 2C:39-5(d) was improper. He asserts that the trial judge erroneously relied upon Kelly to instruct the jury that self-defense could be justified under Section 5(d)

13

only to spontaneously repel an immediate danger. Montalvo claims the judge misstated the controlling law because self-defense does not turn on whether an immediate, spontaneous danger actually exists but on whether the defendant reasonably believes the danger exists. He argues that the judge did not adequately tailor the charge to his self-defense claim.

The State urges this Court to affirm the Appellate Division's decision. It contends that Montalvo's Second Amendment rights were not violated and that the jury instructions were not plainly erroneous.

First, the State maintains that Montalvo's conduct "exceeded legal norms of appropriate force applicable to self-defense" and was disproportionate to the harm he allegedly faced. The State claims that Montalvo did not have a reasonable belief that Daleckis was armed. It further argues that Montalvo used the machete to damage the porch outside of the home, which the Second Amendment does not protect. The State characterizes such use of the machete as offensive rather than defensive.

Second, the State asserts that because Montalvo failed to object to the jury charge during the trial, we must review the charge for plain error and reverse only if it was clearly capable of producing an unjust result. The State avers that the charge does not constitute plain error. The State stresses that even if Montalvo had a right to possess the machete in his home

14

for self-defense, the charge would not produce an unjust result. In accordance with N.J.S.A. 2C:3-4, Montalvo would have to show that he reasonably believed his defensive conduct was necessary to prevent harm and that his defensive conduct was not disproportionate to the perceived threat. The State asserts that Montalvo made no such showing.

Specifically, the State contends that there was no justification for Montalvo's actions inside his home or on the porch outside his home because he did not face immediate harm. Relying on Kelly, the State claims that self-defense justifies an offense under N.J.S.A. 2C:39-5(d) only when a person spontaneously possesses a weapon to repel immediate danger. Thus, the State argues that Kelly applies to any self-defense claim and rendered the jury charge proper.

We granted the Attorney General amicus curiae status in this case. The Attorney General echoes many of the State's arguments and urges this Court to reaffirm the constitutionality of N.J.S.A. 2C:39-5(d).

The Attorney General asserts that the Second Amendment did not protect Montalvo's use of the machete on the porch because it occurred outside the home. The Attorney General does not dispute that possession of a weapon in the home under circumstances supporting a "valid self-defense claim" is lawful. But the Attorney General maintains that self-defense is

15

inapplicable in this case because Montalvo's actions were not defensive, reasonable, or spontaneous.

The Attorney General also recommends that this Court modify or replace the existing Model Jury Charge for N.J.S.A. 2C:39-5(d) to address circumstances similar to those presented in this case. Specifically, the Attorney General asks this Court to explain that passive possession of a weapon in the home for self-defense is not a crime per se but that individuals may use weapons for active self-defense only if they arm themselves spontaneously to repel an immediate danger.

III.

To evaluate the adequacy of the jury instructions at the heart of this appeal, we first review the legal principles that those instructions were intended to convey.

A.

New Jersey has three classes of possessory weapons offenses. State v. Lee, 96 N.J. 156, 160 (1984). Although the classes serve distinct purposes, they "should not be considered as mutually exclusive." Id. at 161. The first class per se criminalizes the possession of certain types of weapons such as sawed-off shotguns and also bans weapons such as switchblade knives unless the possessor can demonstrate an "explainable lawful purpose." Id. at 160 (citing N.J.S.A. 2C:39-3).

16

The second class of possessory offenses "prohibits the possession of a weapon with the intent to use it against the person or property of another."  Ibid. (citing N.J.S.A. 2C:39-4).

The third and final class, which is at issue in this case, prohibits the possession of any weapon, other than certain firearms, when an actor "has not yet formed an intent to use [the] object as a weapon [but] possesses it under circumstances in which it is likely to be so used."  Id. at 161 (citing N.J.S.A. 2C:39-5(d)).  The third class of possessory weapons offenses is codified by N.J.S.A. 2C:39-5(d), which states that "[a]ny person who knowingly has in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have is guilty of a crime of the fourth degree."  The purpose of Section 5(d) is to "protect[] citizens from the threat of harm while permitting the use of objects such as knives in a manner consistent with a free and civilized society."  Lee, supra, 96 N.J. at 162.  The statute applies to circumstances resulting in a threat of harm to persons or property.  State in Interest of G.C., 179 N.J. 475, 481-84 (2004).

A machete constitutes a "weapon" within this statutory scheme.  See N.J.S.A. 2C:39-1(r) (defining weapon as "anything readily capable of lethal use or inflicting serious bodily

17

injury"); State v. Irizarry, 270 N.J. Super. 669, 673 (App. Div. 1994) (observing N.J.S.A. 2C:39-5(d) concerns weapons "such as knives and machetes[] that have both lawful and unlawful uses").

Although possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), calls for an inquiry into the intent of the possessor of a weapon, intent is not an element of unlawful possession of a weapon, N.J.S.A. 2C:39-5(d).  Kelly, supra, 118 N.J. at 380; Lee, supra, 96 N.J. at 162-63; State v. Wright, 96 N.J. 170, 171 (1984), appeal dismissed, 469 U.S. 1146, 105 S. Ct. 890, 83 L. Ed. 2d 906 (1985).  Therefore, the proper Section 5(d) inquiry is not one of intent, "but whether the circumstances surrounding the possession were manifestly appropriate" for lawful use.  State v. Colon, 186 N.J. Super. 355, 357 (App. Div. 1982) (per curiam).  For instance, under different circumstances a machete can constitute a lethal weapon or a deep-sea fishing tool.  Lee, supra, 96 N.J at 161 (citing State v. Hay, 153 N.J. Super. 346, 349 (App. Div. 1977), certif. denied, 75 N.J. 600 (1978)).  We previously determined that the statutory language of N.J.S.A. 2C:39-5(d) is not unconstitutionally overbroad or vague.  Id. at 164-67; Wright, supra, 96 N.J. at 171.

In determining whether the use of a weapon is manifestly appropriate or inappropriate under the circumstances, a jury must look to the facts of the case and not to the subjective

18

intent of the actor. Compare Lee, supra, 96 N.J. at 164-67 (upholding defendant's conviction for possessing scissors taped to simulate stiletto while burglarizing home because "[i]t would be difficult to imagine a less appropriate possession of" that instrument), and Wright, supra, 96 N.J. at 172-73 (reinstating defendant's conviction for possessing Exacto knife, strapped to leg, while wandering neighborhood), with State v. Blaine, 221 N.J. Super. 66, 70-71 (App. Div. 1987) (finding defendant walking down street with pocketknife in pocket insufficient for conviction), and State v. Riley, 306 N.J. Super. 141, 149-51 (App. Div. 1997) (reversing defendant's conviction for carrying but not displaying or brandishing pocketknife while committing robbery).

## B.

Self-defense is a potential defense to a possessory weapons offense. The Second Amendment of the United States Constitution states, "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," District of Columbia v. Heller, 554 U.S. 570, 592, 128 S. Ct. 2783, 2797, 171 L. Ed. 2d 637, 657 (2008), and fully applies to the States, McDonald v. City of Chicago, 561 U.S. 742, 750, 130 S. Ct. 3020,

3026, 177 L. Ed. 2d 894, 903 (2010).  It extends to "all instruments that constitute bearable arms."  Heller, supra, 554 U.S. at 582, 128 S. Ct. at 2792, 171 L. Ed. 2d at 651.

In Heller, the Supreme Court recognized that "the inherent right of self-defense has been central to the Second Amendment right."  Id. at 628, 128 S. Ct. at 2817, 171 L. Ed. 2d at 679. New Jersey's statutes protect the right of self-defense. Generally, the use of force against another person "is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by" another.  N.J.S.A. 2C:3-4(a).  The use of deadly force for self-defense is justifiable only when the actor reasonably believes that such force is necessary to protect himself against death or serious bodily injury, unless the actor provoked the use of force or knows he can safely retreat.  N.J.S.A. 2C:3-4(b)(2).  Thus, the defensive conduct must be based on a reasonable belief of potential harm, and the defensive force must be proportional to the offensive force.

This Court has previously considered the justification of self-defense in relation to a violation of N.J.S.A. 2C:39-5(d). In State v. Harmon, we held that self-defense does not excuse the possession of a weapon under N.J.S.A. 2C:39-5(d) except "in those rare and momentary circumstances where an individual arms

20

himself spontaneously to meet an immediate danger." 104 N.J. 189, 208-09 (1986).

In Kelly, supra, we found that no self-defense instruction was warranted in the absence of such spontaneous action during a street encounter. 118 N.J. at 385-87. In that case, the defendant armed herself with a carpet-cutting razor before leaving her home to take her child out for a walk. Id. at 374. She did so because her child's father, who had severely beaten her in the past, warned her not to walk past a certain street corner. Id. at 373-74. When the defendant passed the corner, her abuser began punching her; she, in turn, slashed him repeatedly with the razor. Id. at 374-75.

We held that because the defendant armed herself with the razor before leaving her home in anticipation of using it for self-defense, a self-defense instruction was not required. Id. at 385-87. We observed, however, that if the defendant had "seized the weapon spontaneously and used it to defend herself against a life-threatening attack, then, she would not have possessed the weapon for a manifestly inappropriate purpose." Id. at 385.

### C.

The home is accorded special treatment within the justification of self-defense. In Heller, supra, the United States Supreme Court emphasized the right to possess weapons in

21

the home, "where the need for defense of self, family, and property is most acute." 554 U.S. at 628, 128 S. Ct. at 2817, 171 L. Ed. 2d at 679.

New Jersey law reflects that principle. For example, although "[t]raditionally self-defense claims require that a person who can safely retreat from the confrontation avail themselves of that means of escape," that requirement is suspended under the "castle doctrine . . . if the confrontation takes place in one's home or 'castle.'" State v. Gartland, 149 N.J. 456, 466 (1997) (quoting Beth Bjerregaard & Anita N. Blowers, Chartering a New Frontier for Self-Defense Claims: The Applicability of the Battered Person Syndrome as a Defense for Parricide Offenders, 33 U. Louisville J. Fam. L. 843, 870-71 (1995)); see also N.J.S.A. 2C:3-4(b)(2)(b)(i) (providing there is no duty for anyone who is not initial aggressor in physical confrontation "to retreat from [one's] dwelling"); N.J.S.A. 2C:3-4(c)(1) ("[T]he use of force or deadly force upon or toward an intruder who is unlawfully in a dwelling is justifiable when the actor reasonably believes that the force is immediately necessary for the purpose of protecting himself or other persons in the dwelling . . . .").

Having reviewed the possessory offense at issue here as well as the justification of self-defense both as a general

22

matter and in relation to the home, we turn to the jury instructions.

IV.

Jury instructions demand careful attention. They "must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). Without an objection at the time a jury instruction is given, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." Id. at 182.

When a party does not object to a jury instruction, this Court reviews the instruction for plain error. R. 1:7-2; State v. Wakefield, 190 N.J. 397, 472-73 (2007), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169 L. Ed. 2d 817 (2008). Plain error refers to any error "clearly capable of producing an unjust result." R. 2:10-2. Regarding a jury instruction, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Chapland, 187 N.J. 275, 289 (2006) (quoting

23

State v. Hock, 54 N.J. 526, 538 (1969), cert. denied, 399 U.S. 930, 90 S. Ct. 2254, 26 L. Ed. 2d 797 (1970)).

The record in this case demonstrates that Montalvo's trial counsel did not object to the jury instructions for N.J.S.A. 2C:39-5(d), including the language from Kelly.  Therefore, we must assess whether the jury instructions prejudicially affected Montalvo's substantial rights and could have led to an unjust result.  Ibid.

V.

Considering the jury instructions given in this case against the backdrop of the legal principles they were designed to convey, we cannot agree with the Appellate Division's holding that the jury instructions for the N.J.S.A. 2C:39-5(d) charge do not warrant reversal.  We find, rather, that the instructions constitute plain error.

A.

The court provided a self-defense instruction for Count One -- violation of N.J.S.A. 2C:39-4(d) -- that included instructions taken from the Model Jury Charge for that statute, which, in turn, contains elements of the generic model charge for self-defense.  See Model Jury Charges (Criminal), "Possession of Weapon with a Purpose to Use It Unlawfully Against the Person or Property of Another (N.J.S.A. 2C:39-4(d))" (June 16, 2003) (directing court to charge paragraphs explaining

24

self-defense justification "[i]f the defendant raises the issue of protective purpose"); see also Model Jury Charges (Criminal), "Justification - Self Defense in Self Protection (N.J.S.A. 2C:3-4)" (June 13, 2011) (generic self-defense charge).

Unlike the model charge for N.J.S.A. 2C:39-4(d), the model charge for N.J.S.A. 2C:39-5(d) contains no acknowledgment that a self-defense justification might be raised. Thus, in response to the jury's question, the court relied not on general self-defense principles, but on language it found in Kelly, in which self-defense was raised in connection with Section 5(d).

However, our holding in Kelly is not applicable to Montalvo's situation. In Kelly, supra, the defendant armed herself with a carpet-cutting razor in anticipation of a future conflict outside the home. 118 N.J. at 373-74. She admitted to knowing that it was inappropriate to carry the razor outside the home with no appropriate purpose, but armed herself anyway. Id. at 385-86. Rather than lawfully defending herself in her home, the defendant armed herself with the intention of using the razor as a weapon outside the home. Id. at 373-74.

The defendant's use of the razor in Kelly is precisely the improper and unlawful use the Legislature targeted when it enacted Section 5(d). Id. at 386. We applied the spontaneity requirement in Kelly because the only scenario in which the defendant's use could constitute lawful self-defense would be if

25

she had a manifestly lawful purpose to carry the razor, then suddenly and spontaneously used it as a weapon to repel immediate harm.  Id. at 385-87.  At the same time, if the defendant had kept the carpet cutter in her home for self-defense purposes, that would not constitute an unlawful use.

The facts in this case are distinguishable from Kelly. Here, Montalvo legally possessed a machete in his home.  It is of no matter whether his possession was for roofing or for self-defense because either would qualify as a lawful purpose.

The parties present contentions about the proper application of the Second Amendment and suggest that this Court adopt constitutional tests developed in other jurisdictions. But this case does not demand an extensive Second Amendment analysis.  We need only observe that the Second Amendment protects the right of individuals to possess weapons, including machetes, in the home for self-defense purposes.  See Heller, supra, 554 U.S. at 582, 592, 628, 128 S. Ct. at 2791-92, 2797, 2817, 171 L. Ed. 2d at 651, 657, 679.  Thus, Montalvo had a constitutional right to possess the machete in his home for his own defense and that of his pregnant wife.  Because the court's instructions did not convey this principle, the instructions were erroneous.

B.

26

Further, because the erroneous instructions were capable of producing an unjust result in this matter, we hold that they constitute plain error. Chapland, supra, 187 N.J. at 289.

If the jurors believed Montalvo's version of events, he never left his apartment with the machete, never used it against person or property, and never raised it toward Daleckis. Such possession is protected by the Second Amendment and is consistent with our statutory scheme and caselaw.

The State asserts that answering an angry knock at the door with a weapon in hand constitutes possession "under circumstances not manifestly appropriate for such lawful uses as it may have." That position is untenable. The right to possess a weapon in one's own home for self-defense would be of little effect if one were required to keep the weapon out-of-hand, picking it up only "spontaneously." Such a rule would negate the purpose of possessing a weapon for defense of the home. It would mean that an individual could lawfully answer the door with a loaded gun in a holster yet would be criminally liable if he held a cutting tool in hand. In short, Montalvo's holding of the machete was a lawful use of that weapon under his version of events.

On the other hand, the jurors could have convicted Montalvo under N.J.S.A. 2C:39-5(d) if they believed Daleckis's account that Montalvo threatened him with the machete unprovoked, then

27

exited the apartment and chopped at the shared porch.  We do not doubt that chopping the porch with a machete without having a lawful purpose may constitute possession under circumstances not manifestly appropriate for lawful use.  See G.C., supra, 179 N.J. at 481-84 (finding Section 5(d) applicable where defendant damaged private property with paintball gun).

The record does not provide us with the information needed to determine which version of events the jury relied upon to convict Montalvo under N.J.S.A. 2C:39-5(d).  We will not speculate about the foundations of the jury verdict.  See Harmon, supra, 104 N.J. at 216 (declining to engage in such inconclusive speculation).

Here, because the jury instructions permitted the jurors to convict Montalvo either upon a valid theory of guilt -- threatening Daleckis with the machete unprovoked or taking the machete outside and damaging the porch -- or upon an invalid theory -- holding the machete when answering the door -- and because we cannot know upon which theory the jury found Montalvo guilty, we find that the jury instructions were clearly capable of producing an unjust result.  R. 2:10-2; Chapland, supra, 187 N.J. at 289; see also Stromberg v. California, 283 U.S. 359, 368, 51 S. Ct. 532, 535, 75 L. Ed. 1117, 1122 (1931) (noting that potential for reliance on invalid ground vitiates conviction notwithstanding presence of valid grounds for

conviction).  We therefore reverse the judgment of the Appellate Division.

VI.

We also direct our Committee on Model Criminal Jury Charges to review and revise the charge for N.J.S.A. 2C:39-5(d).

In instructing the jury on unlawful possession of a weapon, the trial court substantially relied upon the Model Jury Charge for Section 5(d), which does not contain self-defense language. Accordingly, we hold that a modified jury instruction is necessary to clarify that possession of a lawful weapon in one's home cannot form the basis of a conviction under N.J.S.A. 2C:39-5(d).  Therefore, we direct the Committee to refashion the charge consistent with this opinion.  Cf. G.C., supra, 179 N.J. at 484 (directing Committee to modify charge for Section 5(d) to include threats to property).

We suggest the following language for the Committee's consideration in refashioning the charge:  Determining whether the State has proven beyond a reasonable doubt that defendant possessed a weapon in his home under circumstances not manifestly appropriate for a lawful use requires special considerations.  Persons may lawfully possess weapons in their homes, even though possession of those same weapons may not be manifestly appropriate outside the home.  Using a twelve-inch steak knife in a kitchen to prepare dinner is lawful and

29

possessing it as means of defense in case of a home invasion is lawful as well; carrying the same knife on the street on the way to pick up groceries may not be manifestly appropriate.

Individuals may possess in their homes objects that serve multiple lawful purposes, including the purpose of anticipatory self-defense. In this case, Montalvo possessed at home a machete he used in his roofing job. He was lawfully entitled to possess that machete as a weapon in his home as a means of defending himself and his family from attack as well. The right to possess that weapon, however, does not mean that it can be used without justification.

An individual who responds to the door of his home with a concealed weapon that threatens no one acts within the bounds of the law. He need give no justification for what he is lawfully allowed to do.

On the other hand, an individual may not threaten another with a weapon, even within the confines of his home, without lawful justification. Thus, Montalvo could not answer the door threatening the use of a machete merely for the purpose of inciting fear in another. He could threaten the use of the machete, however, if he had a sincere or reasonable belief that the show of such force was necessary to protect himself or his wife from an imminent attack.

The burden always remains on the State to prove that defendant did not lawfully possess the weapon in his home or, if the weapon was threatened against another, that possession of the weapon was not manifestly appropriate for the purpose of self-defense.

We note, in so doing, that the spontaneity requirement of Kelly, from which the trial court quoted in response to the jury's question, is not applicable to possession of a legal weapon in the home for self-defense purposes. Trial courts should not rely on it in tailoring N.J.S.A. 2C:39-5(d) jury instructions to such cases.

VII.

The jury instructions provided for N.J.S.A. 2C:39-5(d) constitute plain error. We therefore reverse the judgment of the Appellate Division and remand for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion.

31