NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0525-13T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

IVELIS TURELL,

 Defendant-Appellant.
___________________________________________

 Submitted January 31, 2017 – Decided October 27, 2017

 Before Judges Messano, Suter, and Guadagno.

 On appeal from the Superior Court of New
 Jersey, Law Division, Mercer County,
 Indictment No. 09-02-0161.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Charles H. Landesman,
 Designated Counsel, on the brief).

 Angelo J. Onofri, Mercer County Prosecutor,
 attorney for respondent (Laura Sunyak,
 Assistant Prosecutor, of counsel and on the
 brief).

PER CURIAM

 Defendant Ivelis Turell appeals her convictions for second-

degree reckless manslaughter and second-degree possession of a

weapon for an unlawful purpose, for shooting and killing her
fiancé, Michael Whitaker. Defendant also appeals her seven-year

sentence, imposed after the two charges were merged. Defendant

claims errors in trial judge's jury charge and subsequent jury

instructions, the prosecutor's summation, and her sentence.

 I.

 Michael Whitaker's father, James Whitaker, Jr., testified

at trial that his son had lived with defendant on Ferry Street

in Trenton for three or four years with their two children. On

April 30, 2007, at approximately 9:00 p.m., James received a

call from Michael. James described Michael as "very upset" and

noticed "a trembling in his voice." Michael told his father, "I

got to get out of here . . . I can't stay here . . . can I come

over and sleep on the couch." James told Michael that he would

leave the door open for him.

 During the call, James could hear defendant "screaming and

yelling" in the background "using some obscene language." James

recalled hearing defendant say something like, "You ain't going

nowhere motherfucker." After two or three minutes, the phone

line "went dead." Michael never arrived that night and James

learned from police the next day that his son was dead.

 911 operator Ricardo Cabrera, received a call at 10:42 p.m.

that evening, from an address on Ferry Street reporting someone

had been shot inside the house. Officers Ismael Rivera, Jr. and

 2 A-0525-13T3
Gregory Hollo arrived within minutes and found Michael lying

face down on the sidewalk near a large pool of blood. Rivera

then noticed defendant sitting in the doorway of the home with

the left side of her body against the wall or door frame and her

feet on the top of the steps. Defendant had blood on the side

of her neck.

 Defendant told Rivera she could not feel the left side of

her body. When Rivera asked what happened, defendant said her

six-year-old son was playing with a handgun and shot Michael.

Rivera asked where the child was and defendant said he was

upstairs sleeping. Hollo found the child upstairs along with

his brother. Rivera described defendant as "calm" and testified

that she spoke in a "[n]ormal speaking sound" when stating that

her son shot Michael. She was not crying and did not appear

upset or disoriented.

 While emergency medical personnel tended to defendant,

Rivera entered the house to secure the handgun he saw on the

floor in front of a bathroom. The gun, a 9-millimeter Ruger

pistol, had blood on the slide and the end of the gun and the

slide was pulled back. There was blood spatter in the kitchen

and blood smears on the wall in the hallway leading to the

kitchen from the living room. A cell phone and pieces of a

phone were also found in the hallway.

 3 A-0525-13T3
 Detective Scott Peterson and Sergeant Richard Fink arrived

at the Ferry Street address and saw defendant sitting on the

porch steps with a female EMT. After the EMT left, Peterson

spoke to defendant who had gauze on her neck and blood on her

shirt. Peterson described defendant as calm and a little upset,

but not crying or disoriented. Defendant said that her six-

year-old son got a hold of her boyfriend's gun and was playing

with it when it accidentally went off, hitting Michael. She

said the child then dropped the gun, causing it to discharge

again with the ricochet hitting her. Defendant was then

transported to the hospital.

 Peterson and Fink went to the hospital and spoke with

defendant in the emergency room. When Peterson asked defendant

to tell him what happened, she told a completely different

story, claiming she and Michael got into an argument over her

son playing with Michael's handgun. At some point during the

argument, defendant claimed Michael choked her in front of the

children. Defendant then retrieved the gun and pointed it at

Michael. When Michael asked what she was doing, she fired the

gun and Michael was hit. She then dropped the gun, it went off,

hitting the ceiling with the ricochet hitting her in the neck.

Defendant also said that she was upset after Michael said he

planned on leaving her and the children.

 4 A-0525-13T3
 During this conversation, Peterson read defendant her

Miranda1 rights. Defendant said she was always in possession of

the gun and made no mention of any type of struggle with Michael

over the gun. Although one side of defendant's neck was

bandaged, Peterson did not see any visible marks on the other

side of her neck from being choked and there were no bruises on

her face.

 Later that evening, Michael died during surgery and

Detective Edgar Rios of the homicide unit took over the case.

Rios spoke with defendant at the hospital. After Rios advised

defendant again of her Miranda rights, she gave a six-minute

recorded statement.2

 Defendant stated, when she arrived home around 7:30 p.m.,

Michael was in the basement bedroom. When Michael told

defendant he wanted to leave, she responded that he could leave

as long as he paid the credit card bills. Defendant then asked

Michael to sign a letter acknowledging the bills and agreeing to

pay them. They began to argue and defendant claimed Michael

retrieved the gun from the top drawer in the bedroom. Defendant

1
 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d
694 (1966).
2
 The 911 call and this recording were not included in the record
on appeal.

 5 A-0525-13T3
grabbed for the gun and, while trying to take it from Michael,

she claimed the gun went off.

 Michael was shot in the right arm, just below the shoulder.

Defendant told Rios that, after the gun went off, Michael fell

onto the bed but then "ended up downstairs." Defendant said

that Michael told her to call 9-1-1. After Michael went

downstairs, defendant followed, carrying the gun. As defendant

was trying to use the phone in the kitchen to call 9-1-1, she

claimed the gun went off with the bullet striking a wall. She

then decided to kill herself and shot herself in the neck.

 One shell casing was found on the shelf of a computer table

just past the bathroom on the first floor and another was found

on the floor in the dining room. A total of five shell casings

were found in the house, although defendant admitted to firing

the gun only three times. Defendant was arrested and charged

with murder and possession of a weapon for an unlawful purpose.

 Defendant testified at trial that Michael was the father of

her two children. She described an incident of domestic

violence in April 2005 when Michael pushed her down the stairs.

Although she was treated at a hospital, she told hospital

personnel she fell down the steps and did not file a police

report. She claims Michael punched her during an argument in

October 2006. Police were called by neighbors but defendant

 6 A-0525-13T3
told them Michael didn't do anything because she didn't want to

get him in trouble.

 Defendant refinanced the house to pay some of Michael's

debts, including child support and car payments. In 2005 and

2006, defendant worked as a bank teller. In December 2006, she

met twice with a counselor to discuss problems at work because

of physical and verbal abuse from Michael. Defendant lost her

job at the bank after making a mistake on a deposit and claimed

Michael "started getting more abusive" with her after that.

 In March 2007, defendant began working as a secretary for a

church. Michael was in the basement of the Ferry Street home at

the time. When defendant went to the basement to check on her

younger child, Michael was angry because she had not cooked

dinner and accused her of "messing with somebody else."

Defendant called Michael a "deadbeat dad" and Michael hit and

choked her in front of their two-year-old. Defendant claimed

she could not breathe and Michael only let go after she kicked

him. When defendant tried to go upstairs, Michael locked her in

the basement. She remained locked in the basement for twenty-

five to thirty minutes and when Michael let her out, she told

him she was tired of him hitting her in front of the kids and

that she had told the priest about "you and your pornos."

Michael then slapped her and she told Michael that he had to

 7 A-0525-13T3
leave. Defendant grabbed a bag from the kitchen and went

upstairs to pack Michael's clothes.

 Defendant packed Michael's clothes as the youngest child

slept on the bed. When Michael came into the room, he asked,

"Bitch, what the fuck you doing with my clothes." She repeated

that he had to leave. Michael then retrieved his gun from the

dresser and pointed it at defendant. As Michael pointed the gun

at her, defendant pushed the gun away. Michael, who was leaning

toward the bed, fell back onto his knees, dropping the gun on

the bed. They struggled for the gun and as defendant was trying

to take the gun from Michael, it went off, striking him. She

claimed it was an accident and that she would never have shot

Michael.

 Michael began to throw up blood and told defendant to call

9-1-1. Defendant claimed the phone in the bedroom did not work

so she grabbed the gun and then went downstairs to the kitchen

to make the call. Michael followed her downstairs. Defendant

claimed she called 9-1-1 but it was "busy." Defendant then shot

herself in the shoulder, with the bullet coming out her back and

hitting the ceiling. She explained that she shot herself

because she "couldn't help him."

 Michael then "got up, and he went towards outside to get

help" and she "dragged" herself towards the phone in the living

 8 A-0525-13T3
room to call 9-1-1. Michael "laid down on the sidewalk."

 Defendant remembered telling a police officer that the gun

went off accidentally, but did not remember talking to Peterson

at the scene or at the emergency room. Defendant recalled

speaking with Rios in the hospital.

 On cross-examination, defendant denied telling the police

that her son had accidentally shot and killed Michael or that

the child had been playing with the gun. She also denied other

statements, including that she told Peterson she had "freaked

out" after she realized that she shot Michael or that the gun

dropped and went off.

 Defendant called Cindy Levine, a licensed clinical social

worker who authenticated a clinical assessment she prepared

after meeting with defendant in December 2006 and confirmed she

met with defendant twice in December 2006 for counseling

services.

 Defendant also called New Jersey State Police Detective

Michael McCormick, who had processed the gun for fingerprints

and found no fingerprints as the gun had been cleaned with

hydrogen peroxide. McCormick did not know who cleaned the gun

but testified it was likely done to remove blood or biohazards

"to render it safe."

 9 A-0525-13T3
 Dr. Raafat Ahmad, the Mercer County Medical Examiner, who

conducted the autopsy for Michael, found the cause of death to

be a gunshot wound to just below the right shoulder. Ahmad

estimated the muzzle of the gun was between twelve and twenty-

four inches away from Michael's arm and classified the manner of

death as homicide.

 On cross-examination, Ahmad agreed that she could not rule

out that some of the additional abrasions on Michael's body were

"due to a fight," but she noted that he was "found dead on the

sidewalk with his hands underneath him."

 Dr. Luis Francis D'Amelio, Chief of Surgery and Director of

Trauma Services for the Capital Health Regional Medical Center,

testified as an expert in trauma, surgery, and pharmacology. He

oversaw the treatment of defendant when she was brought in on

April 30, 2007. Defendant had exploratory surgery on her neck

to determine the extent of her injuries but D'Amelio found the

bullet "went in the neck and went out by the shoulder blade" and

found "nothing else wrong."

 James Joyce, an investigator with the New Jersey State

Police, testified for the State as an expert in ballistics and

firearm identification, that the gun was operable and the two

discharged bullets and five shell casings found at the scene

came from that gun.

 10 A-0525-13T3
 Carl A. Leisinger, III, the owner of CAL III Enterprises, a

forensic ballistics and firearms consulting firm, testified for

defendant as an expert in firearms operability and firearms

identifications. Leisinger challenged the State's expert

opinion about the pull of trigger pressure on the gun.

 On March 21, 2013, the jury returned verdicts of not guilty

on aggravated manslaughter and passion/provocation manslaughter

but guilty on reckless manslaughter and possession of a firearm

with an unlawful purpose.

 On July 12, 2013, the trial judge denied defendant's motion

for a new trial and imposed sentence.

 II.

 Defendant now appeals and raises the following points:

 POINT I

 THE TRIAL JUDGE'S CHARGE TO THE JURY AS TO
 SELF-DEFENSE WAS ERRONEOUS BECAUSE HE DID
 NOT INSTRUCT THE JURY THAT THE DOCTRINE OF
 SELF-DEFENSE APPLIED TO THE LESSER INCLUDED
 OFFENSE OF RECKLESS MANSLAUGHTER.

 POINT II

 THE TRIAL JUDGE'S CHARGE TO THE JURY AS TO
 SELF-DEFENSE WAS ERRONEOUS AND CONTRARY TO
 LAW AS TO THE DUTY OF DEFENDANT TO RETREAT
 FROM HER DWELLING.

 11 A-0525-13T3
 POINT III

 PREJUDICIAL ERROR WAS COMMITTED BY THE TRIAL
 COURT WHEN IT DID NOT INSTRUCT THE JURY THAT
 THE DEFENDANT SHOULD BE FOUND NOT GUILTY OF
 A HOMICIDE IF IT FOUND THAT THE DEATH OF
 MICHAEL WALKER WAS ACCIDENTAL. (NOT RAISED
 BELOW)

 POINT IV

 THE TRIAL JUDGE GAVE THE JURY AN ERRONEOUS
 INSTRUCTION TO CONTINUE DELIBERATIONS WHEN
 IT APPEARED THAT THE JURY WAS UNABLE TO
 REACH A UNANIMOUS DECISION.

 POINT V

 THE PROSECUTOR'S SUMMATION TO THE JURY
 IMPROPERLY SOUGHT A GUILTY VERDICT BY
 APPEALING TO THE JURY'S EMOTIONS RATHER THAN
 ARGUING THE FACTS AND THE EVIDENCE.

 POINT VI

 THE TRIAL JUDGE IN FINDING AGGRAVATING
 FACTOR NINE WHICH INVOKES THE NEED FOR
 DETERRING DEFENDANT AND OTHERS FROM
 VIOLATING THE LAW DID NOT SET FORTH A NEED
 FOR SPECIFIC DETERRENCE.

 Defendant argues that the trial judge erred in failing to

instruct the jury that the doctrine of self-defense applied to

the lesser included offense of aggravated and reckless

manslaughter. The indictment charged defendant with first-

degree murder, N.J.S.A. 2C:11-3(a)(2) (count one); second-degree

possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-

4(a) (count two); and third-degree unlawful possession of a

 12 A-0525-13T3
weapon, N.J.S.A. 2C:39-5(b) (count three). In addition to the

murder charge, the judge submitted the lesser included charges

of passion/provocation manslaughter, aggravated manslaughter,

and reckless manslaughter.

 During a charge conference, the judge circulated a copy of

the proposed charge and noted that counsel had agreed that there

was "not going to be any offering of contrasting factual

theories of causation" or summaries of the "evidence relevant to

recklessness" as such matters would be handled by closing

arguments. The judge specifically stated "[w]e're not going to

summarize the evidence relevant to recklessness, as we're going

to leave that to counsel in closing." Defendant's counsel

raised no objection to the proposed charge.

 After summations, the judge instructed the jury, "the

indictment charges that the Defendant has committed the crime of

murder. The Defendant contends that . . . if the State proved

she used or threatened to use force upon the other person, that

such force was justifiably used for her self-protection or

protection of others." The judge went on to provide a

comprehensive instruction on self-defense, followed by the

elements of murder, passion/provocation manslaughter, aggravated

manslaughter, and reckless manslaughter.

 13 A-0525-13T3
 When the judge instructed as to the firearm possession

charge, he referred back to the self-defense instruction and

noted:

 Earlier in the charge, I instructed you on the
 concept of self-defense as it applies to the
 offense of murder. The concept of self-
 defense as it applies to that offense is
 different than that of protective purpose that
 applies to this count of the indictment. When
 applied to that offense, self-defense requires
 a defendant to have an honest and a reasonable
 belief in the need to use force.

 Defendant made no objection to judge's charge and made no

request to recharge self-defense as to the lesser included

offenses. As a result, this issue will be reviewed as one of

plain error. R. 2:10-2. Applying that standard, an error is

reversible if it was "clearly capable of producing an unjust

result." Ibid. "If a defendant fails to object to a trial

court's instructions, the failure to challenge the jury charge

is considered a waiver to object to the instruction on appeal."

State v. Maloney, 216 N.J. 91, 104 (2013) (citing Rule 1:7-2).

 Plain error in the context of a jury charge
 is "[l]egal impropriety in the charge
 prejudicially affecting the substantial
 rights of the defendant sufficiently
 grievous to justify notice by the reviewing
 court and to convince the court that of
 itself the error possessed a clear capacity
 to bring about an unjust result."

 14 A-0525-13T3
 [State v. Torres, 183 N.J. 554, 564 (2005)
 (alteration in original) (quoting State v.
 Jordan, 147 N.J. 409, 422 (1997))].

"The charge must be read as a whole in determining whether there

was any error." Ibid.

 Defendant claims that, after giving the jury a self-

defense charge prior to the murder instruction, the judge's

failure to repeat the self-defense charge "for the lesser

included offenses of aggravated manslaughter and reckless

manslaughter . . . was erroneous and prejudicial."

 When defendant's sentencing counsel moved for a new trial,

he raised the same issue. In denying the motion, the trial

judge noted that defendant's trial testimony was that Michael

was shot accidentally, when he dropped the gun on the bed and

defendant grabbed it and did not support a self-defense charge.

 Defendant relies on State v. Rodriguez, 195 N.J. 165 (2008)

and State v. O'Neil, 219 N.J. 598 (2014), in support of her

claim that self-defense is applicable to a charge of reckless

manslaughter and that therefore the court erred in failing to

instruct the jury as such.

 In Rodriguez, the Court "held that a person who acts in

self-defense and 'kills in the honest and reasonable belief that

the protection of his own life requires the use of deadly force'

cannot be convicted of murder, aggravated manslaughter, or

 15 A-0525-13T3
manslaughter." O'Neil, supra, 219 N.J. at 601 (quoting Rodriguez

supra, 195 N.J. at 172). Where the evidence could support self-

defense as the justification for a homicide, the trial judge

must instruct the jury that self-defense is a complete defense

to aggravated and reckless manslaughter as well as to murder and

that the State has the burden to disprove the self-defense

justification. Rodriguez, supra, 195 N.J. at 174-75.

 Here, defendant alleged that the gun went off accidentally,

not that she shot Michael in self-defense. The trial judge

determined that defendant's trial counsel "remain[ed] silent"

and did not request a self-defense charge on the manslaughter

charges or object when it was not given. In the absence of such

a request, we must now determine whether the trial judge was

required to sua sponte charge self-defense as to the lesser

included reckless manslaughter charge.

 The judge based his decision on his finding that "even when

the gun was being pointed in [defendant's] face, she was not

under any fear that she was being subjected to deadly force."

The judge relied on defendant's testimony that when Michael

pointed the gun at her, she did not believe he was going to pull

the trigger and waived her hand "like she was swatting away a

fly." The judge also concluded that there was no struggle for

the gun.

 16 A-0525-13T3
 Our review of defendant's testimony does not support the

judge's conclusions. Defendant testified that when Michael

retrieved the gun and pointed it at her she said, "Mike, you

better take that gun away from me." When asked how she felt

when the gun was pointed at her, defendant replied, "I was

scared. He already had finished choking me, where I didn’t have

no breathing, I was dizzy." When Michael fell and the gun

dropped to the bed, defendant clearly testified that she and

Michael "struggled for the gun. . . . we were struggling for

like a minute, he tried to grab it. I end up grabbing it,

pulling it towards me, and it went off."

 Based on this testimony, the judge was required to instruct

the jury on self-defense not only on the murder charge but on

the manslaughter charges as well. As we are remanding this for

a new trial, we take the opportunity to address defendant's

claim that the judge failed to properly instruct the jury as to

defendant's duty to retreat.

 On that subject the judge charged:

 If you find that the Defendant knew that
 she could avoid the necessity of using deadly
 force by retreating, provided that the
 Defendant knew she could do so with complete
 safety, then the defense is not available to
 her.

 17 A-0525-13T3
 The confrontation occurred in defendant's home, which "is

accorded special treatment within the justification of self-

defense." State v. Montalvo, 229 N.J. 300, 319 (2017).

"Traditionally self-defense claims require that a person who can

safely retreat from the confrontation avail themselves of that

means of escape." Id. at 320 (quoting State v. Gartland, 149

N.J. 456, 466 (1997). That requirement is suspended under the

"castle doctrine . . . if the confrontation takes place in one's

home or 'castle.'" Ibid. (alteration in original) (citation

omitted). N.J.S.A. 2C:3-4(b)(2) provides in pertinent part:

 The use of deadly force is not
 justifiable under this section unless the
 actor reasonably believes that such force is
 necessary to protect himself against death or
 serious bodily harm; nor is it justifiable if:

 (a) The actor, with the purpose of
 causing death or serious bodily harm,
 provoked the use of force against himself
 in the same encounter; or

 (b) The actor knows that he can avoid
 the necessity of using such force with
 complete safety by retreating or by
 surrendering possession of a thing to a
 person asserting a claim of right thereto
 or by complying with a demand that he
 abstain from any action which he has no
 duty to take, except that:
 (i) The actor is not obliged to
 retreat from his dwelling, unless he
 was the initial aggressor;

 [emphasis added.]

 18 A-0525-13T3
 Because defendant did not request this instruction and the

judge did not provide it, we review this instruction for plain

error. R. 1:7-2. Plain error refers to any error "clearly

capable of producing an unjust result." R. 2:10-2. Regarding a

jury instruction, "plain error requires demonstration of 'legal

impropriety in the charge prejudicially affecting the

substantial rights of the defendant and sufficiently grievous to

justify notice by the reviewing court and to convince the court

that of itself the error possessed a clear capacity to bring

about an unjust result.'" State v. Chapland, 187 N.J. 275, 289

(2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969), cert.

denied, 399 U.S. 930, 90 S. Ct. 2254, 26 L. Ed. 2d 797 (1970)).

 The State argues that defendant's acquittal on the murder

charges renders any "perceived error" in the duty to retreat

instructions harmless. We disagree. Defendant testified that

Michael was the initial aggressor, retrieving the gun from the

dresser and pointing it at her. Under these circumstances,

defendant had no duty to retreat and the judge's failure to

convey this principle rendered the instructions erroneous.

Because the erroneous instructions were capable of producing an

unjust result in this matter, we hold that they constitute plain

error. Montalvo, supra, 229 N.J. at 323.

 19 A-0525-13T3
 Defendant's convictions are reversed and the matter is

remanded for a new trial on the reckless manslaughter and

weapons charges. We do not retain jurisdiction.

 20 A-0525-13T3