**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2047-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANDREW J. HARRIOTT, a/k/a
ANDREW J. HARRIOT,

    Defendant-Appellant.

_____

Argued October 2, 2024 – Decided November 27, 2024

Before Judges Currier, Marczyk and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 19-06-1066.

Marcia H. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Marcia H. Blum, of counsel and on the brief).

Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County

Prosecutor, attorney; Nancy A. Hulett, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions of passion/provocation manslaughter, attempted passion/provocation manslaughter, and various weapons offenses after a shooting of two victims, resulting in one's death. He contends the trial court made several errors in its jury charge, requiring reversal and a new trial. He also asserts errors in the imposition of his sentence.

After reviewing the record in light of the applicable legal principles, we conclude the jury instructions failed to explain that the justification of self-defense applied to the passion-provocation manslaughter and attempted passion-provocation manslaughter charges. Since this error, in conjunction with other errors in the charge, could clearly lead to an unjust result, see Rule 2:10-2, we reverse defendant's convictions and remand for a new trial.

I.

Defendant was charged in an indictment with one count of: first-degree murder, N.J.S.A. 2C:11-3(a); first-degree attempted murder, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).

A.

We derive the facts from the 2021 trial testimony. The events underlying this case took place during and following a themed party at a restaurant/banquet hall in March 2019. The organizer expected 250-300 people to attend the party, and it hired security for the event. Members of the security team were stationed at the door of the venue to check for weapons. The organizer also hired entertainers, including defendant, a musician who performed under the name "Drew Cash."

Within the larger party was a smaller group who were celebrating the life of Al-Tariq Brown, who had been killed the previous year. Among those in attendance were Raheem Bryant and decedent Nashon Brown (Brown), the victims in this case, both of whom were related to Al-Tariq.[1]

The head of security estimated at least 400 people attended the party. According to defendant, when he took the stage around 1:30 a.m., he began chanting "D's up," referring to himself, to drum up excitement for his performance. However, a portion of the crowd reacted poorly, "throwing up gang signs" and making shooting gestures toward the stage. Defendant's friend,

---

[1] Since several individuals share the same surname, we refer to Al-Tariq by his first name. We intend no disrespect.

A-2047-21

David Ninson, was watching the performance and corroborated the crowd's reaction in his testimony.

Investigators later learned that members of the crowd thought defendant was chanting "G's up," with "G's" referring to the "Grape Street Crips." Edison Township Sergeant Loren Long testified that the Crips were "arch rivals" to another gang, the Bloods. Long stated that, according to Bryant, numerous members of the Bloods were in attendance that night; defendant testified that he eventually learned that as well. There was also information that Brown, Bryant, or both, were members of the Bloods at some point and that the shooting might have been gang-related.

As the crowd's discontent began to escalate, there were reports of an altercation. Defendant and Bryant both testified that someone began spraying or splashing champagne, which angered the crowd. Defendant also stated that some individuals "bum-rushed" his reserved table and began "grabbing bottles."

Defendant recalled directing the DJ to "stop the music," so he could "figure out what was going on." However, he testified that "the more . . . we tried to calm the situation down, the more people came over and they [were] just still sending threats." Defendant said, "[t]hey were saying stuff—pardon my language. They were saying . . . I'll smoke one of you crab ass n-words." He

testified that, although he was not in a gang, he understood "crab" to mean "Crip." Around this point, security arrived, announced the party was over, and directed everyone to leave the venue.

From here, witness accounts of events diverge sharply. According to Bryant, defendant left quickly, and Bryant heard defendant saying he was going to get his gun. Bryant described defendant as wearing a "Mets-colored. . . [b]lue and orange" jacket, and he had a tattoo on his neck. Bryant followed defendant out the front door "to see where he was going," then headed back inside and told Brown he was ready to leave and would get his car. Bryant testified that Brown then "start[ed] riling everybody up, telling everybody . . . it's time to leave." Bryant stated that he was unaware Brown "was following behind" him as Bryant headed to the parking lot.

According to Bryant, he got his car, pulled it up to the front of the venue, and began to step out. As he did so, he heard a "pow" sound and, although he did not realize it at the time, was struck by a bullet. Bryant testified that he saw defendant, wearing the "Mets-colored jacket," running away. When Bryant tried to step away from the car, he collapsed. He was later taken to the hospital and treated for gunshot wounds to the face and neck.

5

Defendant testified that after the lights came on in the venue, he began to leave and encountered a friend, David Anderson, who—along with two female friends—was supposed to ride home with him. Defendant planned to get his car and pull it around while Anderson spoke to Brown, and the women collected their things. Defendant said he met another friend, Damien Sapleton, who walked with him toward his car. Near the entrance to the restaurant, defendant noticed some of the "same guys from inside . . . continuing to send threats" at him. As a result of the threats and the rapidly growing crowd, defendant abandoned the plan to pull the car up to the entrance and wait, because he felt like "a sitting duck."

Instead, defendant and Sapleton headed back toward the venue, hoping to find the rest of their party and leave quickly. As they did so, they met another friend, Zey,[2] who told defendant he was worried about defendant's safety and offered him a gun for protection. Defendant testified that he initially said no but was eventually persuaded to take the gun and put it in his jacket pocket, "just in case." He described the weapon as a handgun.

Defendant stated that as he looked and waited for his friends near the entrance to the restaurant, he received more threats. When a man lifted his shirt

[2] Defendant did not know Zey's full name.

A-2047-21

showing he had a gun, defendant began walking away but also put his hand in his pocket, where his gun was, "to get [the man] to back-off." He stated people in the crowd continued to threaten him, repeating: "I'm going to smoke you crab ass n-words." Defendant testified he was "scare[d]" and "just wanted to leave" but "didn't want to abandon" his friends who were counting on him for a ride.

Eventually, defendant began to walk toward his car but was called back by an acquaintance. As defendant turned back, two people approached him. One, who he later learned to be Bryant, was holding his hand in his pocket in such a way that defendant thought he had a gun. The other, who defendant later learned was Brown, turned to Bryant and asked: "Why don't you cap him right now?"

Defendant testified that he turned away from the two men but a group of "three or four" other "guys"—including the person who had earlier "flashed . . . the weapon"—were moving toward him and threatening him. According to defendant, the man who showed him a gun earlier was now "running down with his hand in his sleeve," leading defendant to conclude the man was holding that weapon.

Defendant "felt like [his] life was on the line," and someone was "about to kill" him. He recounted being "ambushed from the back . . . and the front at

7

the same time." Defendant testified he felt "scared" and "trapped," so he "ran away," while simultaneously reaching for his weapon, "to protect [himself] in case" the man he believed was concealing a gun in his sleeve "started shooting." He estimated ten or twelve people were chasing him as he ran back toward the restaurant. Then he heard a gunshot. In response, defendant drew his own weapon and "fired once in the air just to get them to back-off."

After firing into the air, defendant changed direction and ran back toward his car. He stated he heard two more shots, although he did not see the shooters. In the parking lot, defendant saw Ninson running ahead of him. Defendant heard Ninson call out that he saw a gun, then saw Ninson turn and run in another direction.

According to defendant, he then encountered Bryant. He stated Bryant had "a gun in his hand and he was lifting it." Fearing he was about to be killed, defendant fired a single shot "to defend [himself]," then "just kept running." Defendant testified that he did not intend to shoot anyone and he did not know if his bullet struck anyone; he was only interested in defending himself and "reacted" on "instinct." He stated that "if they never ambushed me, tr[ied] to kill me, I would have went home. I was just waiting on my friends to leave."

Defendant said after he fired the shot, he ran to his car and left, fearing he was still in danger.

Ninson testified at trial that he saw at least two strangers armed with guns in the parking lot and shouted that he saw a gun. However, he also admitted he did not tell police about either defendant or the strangers carrying weapons, because he was fearful of reprisal for being a "snitch," particularly once he learned where the strangers were "from" and "what they [were] into."

Shaquana Thomas, part of the Al-Tariq party, testified that, after the party ended, she was in the parking lot when she heard gunshots. She saw Brown, who was approximately ten feet ahead of her, fall and hit his head on a pole. When people turned him over, they observed a bullet wound in his back. Brown was eventually declared dead at the scene. The medical examiner later concluded that Brown died from a gunshot wound to the chest.

Defendant testified that "four or five" shots were fired that evening.[3] The witness testimony about the number of shots fired varied. Ninson testified that he heard "at least four or five shots." Abree Williams, a member of Al-Tariq's

---

[3] It is unclear whether the count of four or five shots includes defendant's two shots.

party, testified to hearing only two shots. Thomas could not remember how many shots she heard.

Bryant's version of events was inconsistent; in his initial statement to police, he said, "I heard pop, then I heard pop, then I heard pop, and then I heard pop," as he walked through the parking lot, indicating four shots. At trial, however, he testified it was "impossible" he ever told investigators he heard four gunshots. He also stated people in the crowd started "spiraling shots" and "[s]piraling shots were going off by the front door."

Investigators recovered only two shell casings, both from the same nine-millimeter gun. However, law enforcement testified that by the time officers arrived at the venue, the parking lot was "chaotic," poorly lit, and filled with hundreds of people, so anyone could have picked up additional casings. In addition, some firearms, specifically revolvers, would not necessarily leave shell casings behind. Experts testified that the two casings were a possible, but not definite, match for the bullet removed from Brown's body. Law enforcement never recovered the weapon used by defendant, so they were unable to test it against either the bullet or the casings.

Defendant explained that he ran "straight to [his] car" after the shooting and "went right home." He stayed in hiding after hearing rumors that someone

was looking for him as he was worried that he would be killed. During this time, Anderson came to collect the gun from defendant and return it to Zey.[4]

Apart from defendant and Bryant, no trial witnesses testified they saw the shootings or could identify the shooter. However, calls to police that night indicate there may have been more than one shooter. One caller described the shooter as a black male, about five feet eleven inches tall, wearing a white jacket and a "skully hat." Police also received a tip about a man in a dark blue jacket and orange shirt. An officer responding to the shooting location found a person fitting that description: a man in a "dark jacket with a[n] orange shirt," riding as a passenger in a car—a silver Chevrolet—that was leaving the venue. However, when the officer attempted to question the occupants, the vehicle sped off, leading the officer on a high-speed chase until the officer had to stop pursuit. Defendant testified he drove a blue Hyundai to the venue that night.

During the trial, the parties used video footage collected from security cameras around the venue. The videos were of varying quality and did not capture a complete view of the area so that some of the events—including the shooting of Brown—happened off screen. However, a camera in the parking lot

---

[4] Anderson died two months after the shooting.

A-2047-21

captured defendant shooting Bryant. Both parties used portions of the footage to support their theories in the case.

B.

Following the close of testimony and summations, the court instructed the jury on the applicable principles of law. The discussion of jury charges between the parties and the court was conducted piecemeal, by telephone and email, and thus largely off the record. The record does not reflect that defense counsel objected to the specific charges at issue on appeal and appellate counsel concedes the issues were not raised before the trial court.

In instructing the jury on the pertinent substantive offenses, the court began with the offense of murder. The court explained that "[a] person is guilty of murder if he, one, causes the victim's death and two, . . . did so purposely . . . or knowingly; and three, did not act in the heat of passion resulting from reasonable provocation." It instructed the jury that the required state of mind—purpose or knowledge—could be discerned from the "circumstances," including "from conduct, words or acts," and that it could infer a purpose to kill from the "use of a deadly weapon such as a handgun." Additionally, the court explained that the jury was required to find causation, that is, that Brown would not have died but for defendant's actions and that the harm was not "too remote," "too

12

accidental . . . or too dependent on another's volitional act" to fairly attribute it to defendant.

The court also told the jury that it could only find defendant guilty of murder if it found each element "beyond a reasonable doubt"; in contrast, if it found "defendant purposely or knowingly caused death and that he did so in the heat of passion from a reasonable provocation, defendant would be guilty of passion or provocation manslaughter." The court identified four elements of passion/provocation manslaughter: "One, there was adequate . . . provocation. Two, the provocation actually impassioned defendant. Three, defendant did not have a reasonable time to cool off between the provocation and the act which caused death. And four, defendant did not actually cool off before committing the act which caused death."

The court explained that provocation was "adequate" if "loss of self-control is a reasonable reaction to the circumstances," that is, that the situation would "arouse the passions of an ordinary person beyond the power of his control." The court cautioned, however, that "words alone" did not fit the criteria, whereas "a threat with a gun or knife or a significant physical confrontation might."

13

The court instructed the jury that it was the State's burden to prove defendant's actions did not fall under the definition of passion/provocation, but that it need disprove only one of the elements to meet that burden. The court did not refer to passion/provocation manslaughter as a lesser-included offense of murder during this portion of the instruction.

The court then explained that, if the jury found defendant not guilty of murder and passion/provocation manslaughter, it must "consider whether defendant should be convicted of the crimes of aggravated or reckless manslaughter." The court did not refer to those charges as lesser-included offenses of murder. Regarding the substance of the offenses, the court charged the jury largely in accordance with the relevant model jury instructions. See Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3(a)(1) and (2), (b)(1) and (b)(2))," at 6-10 (rev. June 8, 2015).

The court then addressed count two, attempted murder, and the interwoven charge of attempted passion/provocation manslaughter. Consistent with the model jury charge,[5] the court identified the elements of attempted murder as:

---

[5] Model Jury Charges (Criminal), "Attempted Murder/Attempted Passion/Provocation Manslaughter (N.J.S.A. 2C:11-3, 2C:11-4 and 2C:5-1)" at 1 (rev. June 13, 2011).

One, that defendant purposely did or admitted [sic] to do anything, which under the circumstances as a reasonable person would believe them to be was an act or omission constituting a substantial step in the course of conduct planned to culminate in the death of Raheem Bryant.

And two, that . . . defendant did not act in the heat of passion arising from reasonable provocation.

The court also explained concepts relevant to attempt, including "substantial step" and "firmness of criminal purpose," occasionally referring back to its prior instructions on concepts like "purpose."

Regarding passion/provocation, the court instructed that if the jury found "beyond a reasonable doubt that the State had proven that . . . defendant purposely attempted to cause the death of Raheem Bryant and that defendant acted in the heat of passion resulting from reasonable provocation," it should convict defendant of attempted passion/provocation manslaughter. As it had with count one, the court listed the four elements of passion/provocation and reiterated it was the State's burden to prove beyond a reasonable doubt the absence of one of the four passion/provocation factors. The court stated: "I just instructed you on the four factors . . . you should apply that law at this time as if I . . . just instructed you."

15

The court then mentioned for the first time the concept of a lesser-included offense, instructing the jury that if it found " defendant not guilty on count two of attempted murder and attempted passion provocation manslaughter, then [it] will have to consider a lesser included charge of . . . various aggravated assaults."  The court gave the model charge on lesser-included offenses, explaining that "[t]he law requires . . . the court instruct the jury with respect to possible less[e]r included offenses even if they are not contained in the indictment," but that the inclusion of the charges "does not mean that the [c]ourt has any opinion one way or another."  Model Jury Charges (Criminal), "Lesser Included Offenses" (approved Feb. 25, 2002).  The court instructed the jury "not to render a verdict on those offenses or answer the questions on the verdict sheet unless" it found defendant not guilty of "the offenses in the indictment."  The court proceeded to instruct the jury on "aggravated assault, serious bodily injury," which it referred to as "the first less[e]r included charge [of] attempted murder."  It then read the charges for "aggravated assault, bodily injury with a deadly weapon, purposely or knowingly," "aggravated assault causing bodily injury [to another] with a deadly weapon recklessly," "aggravated assault significant bodily injury," and "simple assault."

The instructions largely conformed to the applicable model jury charges, except the court omitted the statutory language defining aggravated assault, bodily injury with a deadly weapon, both purposely/knowingly and recklessly, as well as simple assault. See Model Jury Charges (Criminal), "Aggravated Assault—Bodily Injury with Deadly Weapon (Purposely or Knowingly) (N.J.S.A. 2C:12-1b(2))" (rev. Nov. 3, 2008); Model Jury Charges (Criminal), "Aggravated Assault—Bodily Injury with Deadly Weapon (Recklessly) (N.J.S.A. 2C:12-1b(3))" (rev. June 5, 2006); Model Jury Charges (Criminal), "Simple Assault (Bodily Injury) (Lesser Included Offense) (N.J.S.A. 2C:12-1a(1))" (rev. May 8, 2006). The court introduced each of these assault charges as a lesser-included offense of count two.

The court then instructed the jury on self-defense. The court reiterated that "[c]ount one of the indictment charges . . . murder. Count two of the indictment charges . . . attempted murder." It further advised that, "[a]s to these counts of the indictment and the less[e]r charges, . . . defendant contends that if the State proved he used or threatened to use force upon a person, that such force was justifiably used for self-protection or self-defense." It proceeded to define self-defense in accordance with the relevant statute and model jury charge. See N.J.S.A. 2C:3-4; Model Jury Charges (Criminal), "Justification—Self Defense,

In Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011).[6] The court stated that "[t]he use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."

The court properly advised that "[t]he force used by . . . defendant must not be significantly greater than and must be proportionate to the unlawful force threatened or used against . . . defendant." The court explained that if a defendant is facing "death or substantial danger of . . . serious bodily harm, he may resort to deadly force. Otherwise, he may only resort to nondeadly force." In explaining "deadly force," the court provided an illustrative example:

> [I]f one were to purposely fire a firearm in the direction of another person [that] would be an example of deadly force. A mere threat with a firearm, however, intended only to make the victim of the threat believe that the defendant will use the firearm if necessary, is not an example of deadly force.

The court continued, stating a "threat of or even an actual minor attack," could not justify the use of deadly force in response to the action. The court

---

[6]  The Model Jury Charge for self-defense was revised after defendant's trial. See Sup. Ct. of N.J., Notice to the Bar: Updates to Model Criminal Jury Charges (Nov. 13, 2023); cf. Model Jury Charges (Criminal), "Justification—Self Defense, In Self Protection (N.J.S.A. 2C:3-4)" (rev. Nov. 13, 2023).

A-2047-21

instructed the jury that it "must first determine whether . . . defendant used deadly force," and if he did, the jury "must determine if . . . defendant reasonably believed . . . he had to use deadly force. . . ." The court also defined "reasonable belief," before laying out a series of limitations on self-defense: it was not available to defendants who purposely provoked the encounter, or who knew they could safely retreat.

The court did not provide the jury with the remaining portion of the Model Charge—"Non-Deadly Force"—which explains if the jury finds "defendant did use non-deadly force [to defend himself/herself], then you must determine whether the force was justified." Model Jury Charges (Criminal), "Justification—Self-Defense, In Self Protection (N.J.S.A. 2C:3-4)," at 4. The charge provides the conditions for the use of non-deadly force:

> 1. The person reasonably believes he/she must use force; and
>
> 2. The person reasonably believes that the use of force was immediately necessary; and
>
> 3. The person reasonably believes he/she is using force to defend himself/herself against unlawful force; and
>
> 4. The person reasonably believes that the level of the intensity of the force he/she uses is proportionate to the unlawful force he/she is attempting to defend against.
>
> [Id. at 4.]

19

In omitting this part of the charge, the jury was not instructed on what to do if it found that defendant used non-deadly force. In addition, the court did not charge the jury at this point with the portion of the self-defense charge that explains the burden of proof as it relates to self-defense. Id. at 4-5.

Instead, the court gave the instruction on third-party guilt, which it explained applied only to count one. Thereafter, the court instructed the jury on the substantive offenses: count three—unlawful possession of a handgun—and count four—possession of a firearm for an unlawful purpose. The court omitted the definition of "firearm" from count four, on the mistaken belief that it was provided earlier. See Model Jury Charges (Criminal), "Possession of a Firearm With a Purpose to Use It Unlawfully Against the Person or Property of Another (N.J.S.A. 2C:39-4(a))," at 1-2 (rev. Oct. 22, 2018).

In discussing the charge for count four, the court noted it had earlier instructed the jury on "self-defense as it applies to the offense of murder and attempted murder and certain less[e]r included charges," but that the earlier charge differed from the self-defense charge specific to count four. The court stated that where the earlier self-defense charge required an "honest and reasonable belief" that the use of force was necessary, "for the purpose of this

offense, if defendant honestly believed that he needed to use a firearm to protect himself, the law does not require that this belief be reasonable."

The court also issued the instruction on flight pursuant to the model jury charge, informing the jury that while "[m]ere departure from a place where a crime has been committed does not constitute flight," departure due to a fear of "accusation or arrest . . . on the charge involved in the indictment" could constitute "flight," and, thus, "proof of consciousness of guilt."  The court continued by warning the jury that it could "only" consider flight as "evidence of consciousness of guilt if [it] determine[d] that the defendant's purpose in leaving was to evade accusation or arrest for the offense charged."

However, the court left out the next section of the model charge.  See Model Jury Charges (Criminal), "Flight" (rev. May 10, 2010).  Where, as here, a defendant offers an alternative explanation for his departure, the model charge requires the court to "set forth [the] explanation suggested by [the] defense," and explain that if the jury "find[s] defendant's explanation credible, [it] should not draw any inference of . . . defendant's consciousness of guilt from . . . defendant's departure."  Ibid.  The court omitted both the tailored description of defendant's explanation and what to do if the jury accepted the explanation.

After completing the flight instruction, the court gave the remainder of the initial self-defense instruction that it began between counts two and three. It referred to this portion of the self-defense charge as "more general stuff" that would be "a little bit easier to listen to." Specifically, the court instructed the jury, "[t]he State has the burden to prove to you beyond a reasonable doubt that the defense of self-defense is untrue," but that self-defense only applied "if all the conditions or elements previously described exist." The court added that "[t]he same theory applies to the issue of retreat," that is, that "[t]he burden of proof is upon the State to prove beyond a reasonable doubt that defendant kn[e]w he could have retreated with complete safety."

The jury reached its verdict on the third day of deliberations, acquitting defendant of murder and attempted murder, and convicting him of passion/provocation manslaughter, attempted passion/provocation manslaughter, and the related weapons offenses. The court sentenced defendant to the maximum term of ten years for each conviction, with an eighty-five percent parole disqualifier to be served consecutively, resulting in an aggregate sentence of twenty years, subject to a seventeen-year parole disqualifier.

II.

On appeal, defendant raises the following issues for our consideration:

POINT I
THE JURY WAS NOT CHARGED THAT SELF-DEFENSE APPLIED TO THE LESSER-INCLUDED OFFENSES OF PASSION/PROVOCATION MANSLAUGHTER AND ATTEMPTED PASSION/PROVOCATION MANSLAUGHTER.

POINT II
THE JURY WAS NOT CHARGED THAT IT COULD ACQUIT DEFENDANT OF BROWN'S HOMICIDE ON THE GROUND OF SELF-DEFENSE IF IT FOUND, AS DEFENDANT TESTIFIED, THAT HE FIRED A WARNING SHOT UP IN THE AIR.

POINT III
THE INSTRUCTION ON FLIGHT AS CONSCIOUSNESS OF GUILT FAILED TO CHARGE, AS DEFENDANT TESTIFIED, THAT HE FLED BECAUSE HE WAS SCARED FOR HIS LIFE AND THAT HE LATER TURNED HIMSELF IN.

POINT IV
THE MATTER MUST BE REMANDED FOR A NEW SENTENCING HEARING BECAUSE THE SENTENCING PROCEEDING WAS RIDDLED WITH ERROR, BOTH FACTUAL AND LEGAL, AND BECAUSE THE 20-YEAR TERM THE COURT IMPOSED, WHICH IS GREATER THAN THE SENTENCE THE STATE REQUESTED, IS EXCESSIVE.

A. The failure-to-confess and express-remorse errors

B. The error in parsing the jury's passion/provocation verdicts

C. The failure to find mitigating factors (8) and (9)

23

D. The misapplication of the <u>Yarbough</u> factors

E. The <u>Torres</u> error

F. The cumulative effect of the numerous sentencing errors warrants reversal and resentencing, which should be held before a different judge

A.

We begin with a discussion of defendant's arguments regarding the errors in the jury charge. He first contends the court erred by telling the jury that self-defense applied to the charges of murder, attempted murder, and their unenumerated lesser-included offenses, but failed to specify that the defense applied to passion/provocation manslaughter and attempted passion/provocation manslaughter.

Appropriate and proper jury instructions are "essential for a fair trial." <u>State v. Scharf</u>, 225 N.J. 547, 581 (2016) (quoting <u>State v. Reddish</u>, 181 N.J. 553, 613 (2004)). As a result, "[i]t is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case. . . ." <u>Id.</u> at 580 (quoting <u>Reddish</u>, 181 N.J. at 613). This includes "the necessity of tailoring jury instructions to the facts" of an individual case. <u>State v. Frisby</u>, 174 N.J. 583, 600 (2002).

In assessing the adequacy of a jury instruction, we must read the charge in its entirety and determine its overall effect, not simply concentrate on the challenged portion. See State v. Garrison, 228 N.J. 182, 201 (2017). In so doing, "[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law" with respect to the relevant issue. State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

"When a defendant does not request an instruction or fails to object to its omission in the final jury charge, we review the omission of that instruction for plain error." State v. Dunbrack, 245 N.J. 531, 544 (2021) (citing State v. Funderburg, 225 N.J. 66, 79 (2016)); see also R. 1:7-2 ("Except as otherwise provided by R. 1:7-5 and R. 2:10-2 (plain error), no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires. . . ."); cf. State v. Montalvo, 229 N.J. 300, 320 (2017) ("Without an objection at the time a jury instruction is given, 'there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case.'" (quoting State v. Singleton, 211 N.J. 157, 182 (2012))).

In the context of jury instructions, "[t]he plain error standard requires a twofold determination: (1) whether there was error; and (2) whether that error

was 'clearly capable of producing an unjust result,' that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Dunbrack, 245 N.J. at 544 (first quoting R. 2:10-2; and then quoting Funderburg, 225 N.J. at 79). In applying this standard, "[t]he error must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)). If the criteria are met, "reversal is warranted." Dunbrack, 245 N.J. at 544.

Our courts have counseled that erroneous jury instructions are generally "poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." State v. McKinney, 223 N.J. 475, 495-96 (2015) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)). This is particularly true "when the subject matter is fundamental and essential or is substantially material," in which case, the error "is almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (quoting in the first instance State v. Green, 86 N.J. 281, 291 (1981)). Indeed, some errors, such as failure to charge an element of an offense, strike so close to the heart of the jury's ability to deliberate as to require presumptive reversal, even absent a timely objection by

counsel. E.g., Afanador, 151 N.J. at 56; State v. Hodde, 181 N.J. 375, 384 (2004).

As stated, the court began the self-defense portion of the jury charge by instructing the jury that, "[c]ount one of the indictment charges . . . murder. Count two of the indictment charges . . . attempted murder. As to these counts of the indictment and the less[e]r included charges, the defendant contends . . . [any] force was justifiably used for self-protection or self-defense." Later, in discussing self-defense applicable to count four—possession of a firearm for an unlawful purpose—the court stated it had previously instructed the jury on self-defense as applied to "murder and attempted murder and certain less[e]r included charges." However, the court did not list the lesser-included charges in either instance.

In fact, the court's substantive instructions acknowledged only the assault charges subsidiary to count two, attempted murder, as lesser-included offenses, labelling them both together and individually as "lesser included charge[s]," and accompanying them with an instruction of the definition and meaning of lesser-included offenses. The verdict sheet was more expansive, listing aggravated and reckless manslaughter, as well as all assault charges as lesser-included charges. However, neither the court's instructions nor the verdict sheet ever

referred to the passion/provocation offenses as lesser-included offenses—to which self-defense would apply by implication. The jury was never directly advised that self-defense could apply to passion/provocation offenses.

Our courts have repeatedly held that the failure to issue offense-specific self-defense charges constitutes reversible error, even under a plain error standard, and even where a similar charge has been given for other offenses. See Montalvo, 229 N.J. at 310-12, 323-24 (holding that omitting a self-defense instruction for one weapons offense required reversal because it was impossible to tell whether the conviction was a product of a misapprehension of the law); State v. Rodriguez, 195 N.J. 165, 170-73, 175 (2008) (finding plain error where the court explicitly told the jury that self-defense applied only to murder, not manslaughter); State v. Gentry, 439 N.J. Super. 57, 67 (App. Div. 2015) ("Where there is sufficient evidence to warrant a self-defense charge, failure to instruct the jury that self-defense is a complete justification for manslaughter offenses as well as for murder constitutes plain error."). The assertion of reversible error is particularly strong when a defendant is acquitted of a charge for which a proper self-defense instruction was charged but convicted of another for which it is not. Montalvo, 229 N.J. at 307, 313.

Recently, in State v. Supreme Life, 473 N.J. Super. 165, 168 (App. Div. 2022), this court applied similar principles when the defendant was acquitted of murder but convicted of passion/provocation manslaughter. In that case, the court instructed the jury on the elements of several charged offenses, beginning with murder then proceeding through passion/provocation manslaughter, attempted murder, attempted passion/provocation manslaughter, aggravated assault, and multiple weapons offenses. Id. at 176. After delineating each offense, "[t]he judge . . . told the jury, 'The indictment charges [defendant] with murder and attempted murder,'" before explaining the defenses of self-defense and defense of another. Id. at 177 (second alteration in original).

The court did not, however, specify which of the charges the defenses applied to apart from murder and attempted murder. Ibid. It "never told the jury it also should consider those affirmative defenses if or when it considered the lesser-included charge of passion-provocation manslaughter." Ibid. The defendant was acquitted of murder but convicted of passion/provocation manslaughter. Id. at 169.

Despite the lack of any objection to the charge at trial, this court reversed the convictions, stating:

> [H]aving acquitted defendant of . . . murder, it was imperative for the jury to understand the very same

> principles of self-defense and defense of another applied to their consideration of the lesser-included manslaughter offense. It was plain error for the judge to omit specific instructions advising the jury that it should consider the affirmative defenses as to all the lesser-included offenses.
>
> [Id. at 177.]

Here, unlike in Supreme Life, the court did instruct the jury that self-defense applied to "less[e]r included" offenses. However, the court did not adequately explain which charges fell under the umbrella of "lesser-included offense"—a term of art that the jury is not tasked to independently understand. Cf. Petrillo v. Bachenberg, 263 N.J. Super. 472, 480 (App. Div. 1993) (holding that a charge that included "a legal term of art consisting of certain elements of which the jury was never informed" was improper).

To the contrary, the court labeled certain charges—the assault charges in its initial instruction, the assault and aggravated/reckless manslaughter charges on the verdict sheet—as "less[e]r included," while omitting the passion/provocation charges. Therefore, the jury may have concluded that because some charges were specifically labeled lesser-included offenses meant that the other charges were categorically not, as such an omission "implies that [it] was intentional, not an oversight." Cf. Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 112 (2004) (explaining the doctrine of "expressio unius est

30

exclusio alterius--expression of one thing suggests the exclusion of another left unmentioned" (citing <u>Chevron U.S.A. Inc. v. Echazabal</u>, 536 U.S. 73, 80 (2002))).

Moreover, an uninstructed juror could conclude that the reasonable belief and necessity standards that govern self-defense are fundamentally at odds with the actual and ongoing provocation required for passion/provocation. The conclusion that self-defense could not apply to all available charges was further encouraged by the court's statement that it had instructed the jury on "self-defense as it applies to . . . <u>certain</u> less[e]r included charges," implying that it did not apply to all lesser-included offenses. (emphasis added).

The assumption that the court intended to exclude passion/provocation offenses from the lesser-included offenses eligible for self-defense exoneration is reinforced by other details of the charge and verdict form. Every lesser-included offense, except for the passion/provocation offenses was labeled as such an offense. Conversely, the court did not refer to passion/provocation as a separate offense, but rather as an "element" of murder or attempted murder.

While this presentation was appropriate for the interwoven offenses, it nonetheless increased the likelihood that the jury would not understand that self-defense was available for passion/provocation offenses. This risk could have

31

been averted either by specifying that passion/provocation offenses were lesser-included offenses or, more directly, by simply instructing that self-defense applied to passion/provocation offenses.

Because the charge was silent, it remained open to interpretation. An ambiguous charge is just as inimical to the justice system's truth-seeking mission, and to the guarantee of a fair trial, as an erroneous one. Cf. State v. Gonzalez, 444 N.J. Super. 62, 76-78 (App. Div. 2016) (holding that an "inherently ambiguous" instruction "generated numerous ways in which the jury could have convicted without a shared vision," compelling plain-error reversal (citing State v. Gentry, 183 N.J. 30, 32 (2005))).

In sum, the court failed to explicitly state that self-defense was applicable to the passion/provocation charges. The general admonition that self-defense applied to lesser-included offenses failed to adequately set forth "the controlling principles of law" in a way that the jury could apply. Baum, 224 N.J. at 159. Therefore, it is impossible to know whether the jury was operating under a "valid theory" or "invalid theory." Montalvo, 229 N.J. at 324. Under such conditions, our Supreme Court has counseled that such instructional errors are "clearly capable of producing an unjust result." Ibid. (first citing R. 2:10-2; and then citing State v. Chapland, 187 N.J. 275, 289 (2006)).

The issue of self-defense was at the heart of the defense case. Therefore, the instructional error concerns "subject matter [that] is fundamental and essential" and is presumptively reversible. Maloney, 216 N.J. at 104-05 (quoting Green, 86 N.J. at 291). Furthermore, defendant was acquitted of murder and attempted murder—offenses to which the jury knew self-defense applied—compounding the likelihood that the instructional error created an unjust result. Montalvo, 229 N.J. at 307, 310-13; Supreme Life, 473 N.J. Super. at 177; Gentry, 439 N.J. Super. at 69.

We are satisfied this error alone was clearly capable of producing an unjust result, thus requiring reversal. Nevertheless, we provide the following guidance when proceeding with a new trial.

B.

Defendant also asserts instructional error regarding the flight charge. He contends the court erred by failing to highlight for the jury his testimony that he fled the scene of the shooting not to evade the police, but rather to elude those who he feared would kill him. Again, as there was no objection to the charge as given, we review for plain error.

"Evidence of flight or escape from custody by an accused generally is admissible as demonstrating consciousness of guilt[] and is therefore regarded

as probative of guilt." State v. Mann, 132 N.J. 410, 418 (1993). Yet, the link has long been regarded as a tenuous one, since "[d]eparture from the scene . . . itself, does not warrant an inference of guilt." State v. Sullivan, 43 N.J. 209, 238 (1964). Therefore, "for departure to take on the legal significance of flight, there must be some circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt . . . to avoid an accusation based on that guilt." Mann, 132 N.J. at 418-19 (quoting Sullivan, 43 N.J. at 238-39).

Likewise, "[t]he potential for prejudice to the defendant and the marginal probative value of evidence of flight or escape mandate careful consideration of the nature of the evidence admitted and the manner in which it is presented." Id. at 420. Proper presentation must include a meticulous jury charge, instructing the jury that it must find both the fact of departure and an incriminating motive for departure "that would turn the departure into flight, in the legal sense." Id. at 421 (citing State v. Wilson, 57 N.J. 39, 49 (1970)). Moreover, "[i]f a defendant offers an explanation for the departure, the trial court should instruct the jury that if it finds the defendant's explanation credible, it should not draw any inference of the defendant's consciousness of guilt from the defendant's

departure." Ibid. (citing State v. Leak, 128 N.J. Super. 212, 217 (App. Div. 1974)).

The model jury charge for flight directs the court to incorporate both the existence and the substance of the explanation offered by the defendant. For example, the second sentence of the model charge reads: "The defendant denies any flight, (or, the defendant denies that the acts constituted flight)." Model Jury Charges (Criminal), "Flight" at 1. Later, the model charge reads "[t]he defense suggested the following explanation: **(SET FORTH EXPLANATION SUGGESTED BY DEFENSE)** If you find the defendant's explanation credible, you should not draw any inferences of the defendant's consciousness of guilt from the defendant's departure." Id. at 1-2.

Here, the trial court excluded this content from the charge, although it explained the jury could consider flight as evidence of consciousness of guilt if and only if it found that, "defendant, fearing that an accusation or arrest would be made against him on the charge involved in the indictment took refuge in flight for the purpose of evading" the same.

The issue of flight was hotly contested in this case. The State questioned defendant about his departure and flight on the night of the shooting. The prosecutor highlighted that defendant was not at the home he shared with his

parents when police came to execute a warrant three days after the shooting. And defendant did not surrender to police until twelve days after the shooting.

In summation, the prosecutor emphatically argued the "importan[ce]" of flight. He told the jury, "basically what flight says [is] if you find that the defendant fled after shooting Nashon Brown, after shooting Raheem Bryant[,] that's consciousness of guilt." He went on to paraphrase the Bible, saying, "Only the guilty flee when no one pursues. And what's so interesting about that proverb, it understands the human condition. . . . If you didn't do anything wrong, you don't run away. But [defendant] ran away."[7] He added: "You can presume guilt based on his flight."

Conversely, defendant maintained that his actions on the night of the shooting, including his departure from the scene, were motivated by his desire to escape danger. He testified that he was not aware at the time that his shots had hit anyone and was not initially aware the police were looking for him. More specifically, he did not learn of the warrant for his arrest until several days after the shooting. Defendant testified he had learned that someone—not law enforcement—had come to town "looking for him," and so, scared for his life,

---

[7] "The wicked flee when no one pursues, but the righteous are as bold as a lion." Proverbs 28:1.

he avoided his family's home. For the twelve days following the shooting, he laid low, not to "avoid[] being arrested," but to "avoid being killed." Additionally, defendant testified that when he learned of the warrant, he took steps to contact an attorney and, when he found one who agreed to take his case, he turned himself in to police. Consonant with this testimony, defense counsel argued in summation that defendant "fled [be]cause he was in fear for his life."

Guided by Mann and the Model Jury Charges, we are satisfied that the omission of the defense-explanation portion of the charge was error. In looking at the flight charge as a whole and in the context of the case, including the strength of the State's case, the error was clearly capable of producing an unjust result. R. 2:10-2. See Garrison, 228 N.J. at 201; Sanchez-Medina, 231 N.J. at 468. In omitting a tailored description of defendant's contention, the court deprived the jury of relevant context. And the prosecutor amplified the potential harm of the erroneous instruction in his closing statement.

These aggregate errors in the jury instructions caused sufficient damage to the charge to "prejudicially affect[] the substantial rights of the defendant," Montalvo, 229 N.J. at 321. The failure to clarify that self-defense applies to passion/provocation and failure to fully instruct on flight, departure, and consciousness of guilt each dealt with self-defense, the essence of defendant's

theory of the case. When error involves "subject matter . . . fundamental and essential" to a defense, the result is presumptively prejudicial. Maloney, 216 N.J. at 104-05.

Defendant also asserts the court erred in failing to properly tailor the charges to defendant's claim that he fired a warning shot. Specifically, he contends the court should have instructed the jury that warning shots do not constitute deadly force and that a self-defense theory could apply to his warning-shot narrative. Defendant did not raise these issues before the trial court.

Because we have determined a new trial is required resulting from the discussed errors, we need not fully address this argument. Defendant may raise any arguments he feels are appropriate regarding a jury instruction on deadly/non-deadly force during the jury charge conference in the new trial.

For guidance, if the trial court instructs the jury on deadly force and the elements of a valid non-deadly force self-defense, it must fully instruct the jury on what to do with its conclusions. See Model Jury Charges (Criminal), "Justification—Self-Defense, In Self Protection (N.J.S.A. 2C:3-4)" (rev. Nov. 13, 2023). Here, the court only charged the jury on what to do if it found defendant used deadly force and failed to do the same for non-deadly force, risking sending a signal to the jury that deadly force was used. See State v.

O'Brien, 200 N.J. 520, 534-36 (2009) (counseling that the court must take care not to "telegraph to the jury any partiality," particularly a disbelief of a defendant's credibility); State v. Rivera, 437 N.J. Super. 434, 449-50 (App. Div. 2014) ("Our Supreme Court has consistently condemned conduct that invades the exclusive province of the jury to resolve factual disputes, assess credibility and decide whether the State's evidence establishes guilt.").

As stated, several errors in the jury charge were clearly capable of producing an unjust result, requiring reversal of defendant's convictions and a new trial. Therefore, we need not address defendant's arguments regarding his sentence.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION