**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2788-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GIOVANNI A. PISANIELLO,
a/k/a GIAVANNI A.
PISANIELLO,

    Defendant-Appellant.

_____

Argued March 31, 2025 – Decided June 19, 2025

Before Judges Sabatino, Gummer, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 22-07-1144.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Melinda A. Harrigan, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago,

Monmouth County Prosecutor, attorney; Melinda A. Harrigan, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant Giovanni A. Pisaniello was found guilty of: second-degree possession of a Controlled Dangerous Substance ("CDS"), specifically heroin, with intent to distribute it within 500 feet of a public park, N.J.S.A. 2C:35-7.1(a); second-degree conspiracy to commit a park-zone CDS offense, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:35-7.1(a); two third-degree CDS possession offenses, N.J.S.A. 2C:35-10(a)(1) and N.J.S.A. 2C:35-5(b)(3); and third-degree witness tampering, N.J.S.A. 2C:28-5(a)(1). Following the jury's verdict, defendant was also convicted of several violations of Recovery Court probation relating to previous offenses.

The CDS offenses merged at sentencing, resulting in a seven-year custodial term. The court further imposed a consecutive three-year custodial term for the witness tampering offense, yielding an aggregate custodial term of ten years. The sentences on the Recovery Court violations were all made concurrent with that aggregate sentence.

On appeal, defendant raises the following points for our consideration:

A-2788-22

POINT I

THE IMPROPER ADMISSION OF THE NARCOTICS
EXPERT'S OPINION ON DEFENDANT'S STATE OF
MIND REQUIRES REVERSAL OF DEFENDANT'S
CONVICTIONS.

POINT II

THE WITNESS TAMPERING CONVICTION MUST
BE REVERSED BECAUSE OF THE FAILURE TO
INSTRUCT ON THE ESSENTIAL ELEMENT OF
INTENT.  (Not Raised Below)

POINT III[1]

THE COURT ERRED IN DENYING DEFENDANT'S
MOTION TO ADMIT HIM TO RECOVERY COURT.

POINT IV

THE TEN-YEAR AGGREGATE SENTENCE IS
MANIFESTLY EXCESSIVE.

For the reasons that follow, we affirm defendant's convictions of the CDS

offenses and the State's use of the narcotics expert in its case-in-chief.  However,

we vacate the witness tampering conviction because the jury charge on that issue

unconstitutionally omits essential language requiring proof of defendant's intent

to tamper.  Given the vacatur of that conviction, defendant's aggregate sentence

must be revised on remand.

---

[1] Defendant has withdrawn this Recovery Court point.

A-2788-22

I.

The prosecution of defendant and codefendant Frederick Best stemmed from a 2019 investigation of suspected drug dealing out of a motel in Middletown located within 500 feet of a public park. Defendant and Best were living together at the motel. Believing that CDS were being sold out of the motel room, the police arranged for a confidential informant to make two controlled buys of heroin from Best. The police observed Best leave the shared motel room, sell the drugs to the informant, and then return to the motel. Those transactions furnished probable cause for the warrant to search the motel room obtained by the Middletown Police Department.[2]

Police officers executed the warrant in the early morning of August 9, 2019, when both defendant and Best were present in the motel room. The officers found substantial incriminating evidence in the room and on defendant's person. They found in defendant's pockets 350 bags of heroin of various brands and $919 in cash, including rolled-up currency.

The officers seized defendant's cell phone, which contained incriminating text messages with several third parties about drug transactions. Using slang

---

[2] Defendant does not challenge on appeal the issuance and execution of the warrant, nor the court's denial of his pretrial motion to suppress the evidence seized from the motel room.

terminology, the texts included discussions of drug quantities, brands, prices, and delivery arrangements.

Both defendant and Best were arrested, charged with CDS offenses, and detained at the Monmouth County Jail.

Defendant was admittedly a habitual drug user. He claimed that at the time he was living in the motel, he was using about forty bags of heroin daily. Best reported using ten to twenty bags daily. Defendant contended that the heroin the police seized from the motel room was all for the personal use of him and Best. Defendant admitted, however, that he had sold drugs in the past. He claimed he had earned the cash found on him as a handyman's foreman and that he lacked a bank account in which to deposit the money.

Defendant applied for admission to Recovery Court but was rejected. The trial court denied his challenge to that rejection.

Best cooperated with the State. He told the police that in exchange for heroin and being allowed to live in defendant's room, he assisted defendant in selling drugs. Best's narrative was borne out in text messages showing that he had been acting as a delivery person for defendant. Best ultimately entered into a plea agreement with the State, and he testified as a prosecution witness at defendant's trial.

A-2788-22

While defendant and Best were both housed in the county jail, defendant purportedly arranged to provide Best (possibly through an intermediary within the jail) with a drafted affidavit. In that affidavit, which Best believed was pre-filled by defendant, he recanted his police statements and claimed the drugs in the motel room all belonged to him. Best signed the affidavit and had it notarized by a jail social worker. When the State learned of the affidavit, the indictment of defendant was amended to add the witness tampering charge.

At trial, Best explained he had signed the affidavit, even though it was not true, because of his long-standing friendship with defendant and due to "pressure from jail culture." Defendant denied creating the affidavit, contending he had first learned of it from the jail's "legal runner" and that he then forwarded it to his attorney.

The case was tried before a jury in August 2022. In addition to testimony from Best and the lead investigator on the case, the State presented at trial testimony from a detective who is an expert in the field of narcotics distributions and investigations. The expert, whose opinions we discuss in more detail in Part II(A), explained how to distinguish a narcotics street user from a street seller.

After the State rested, defendant moved for a mistrial, arguing the State's expert had improperly testified about the ultimate question of defendant's intent.

6

The court denied the motion, concluding the expert had provided general opinions about drug transactions, without specifically opining as to whether defendant had been selling drugs.

Upon realizing the indictment contained outdated language in the witness tampering count, the State moved to amend the superseding indictment pursuant to Rule 3:7-4, to reflect the current statutory elements of witness tampering. The court granted that application.

Defendant also unsuccessfully moved for an acquittal on the basis that the State had presented insufficient evidence to support a conviction.

During deliberations, pursuant to a request from the jury, the court replayed the portions of Best and defendant's testimony that concerned the witness tampering. The jury issued its verdict that same day, finding defendant guilty on all five counts.

In the interim, the State filed violation-of-probation charges relating to defendant's previous guilty pleas and admission to Recovery Court.

In April 2023, the court sentenced defendant to an aggregate term of ten years on the park-zone offense and witness tampering conviction, with the remaining offenses merging into the park-zone conviction. The court also

7

sentenced defendant to an aggregate term of four years on his violation-of-probation offenses, to run concurrently with his convictions in the present case.

Defendant appealed his convictions and sentence.

## II.

## A.

The first issue concerns defendant's challenge to what he contends are impermissible aspects of the testimony of the State's narcotics expert. The following background informs our analysis of that evidentiary issue.

Prior to trial, defendant moved in limine to bar the expert's testimony, arguing that his testimony was not necessary to evaluate the evidence. Defendant did not challenge the expert's qualifications. However, defendant anticipated the expert would improperly opine on the ultimate issue of guilt, including the element that defendant possessed CDS with an intent to distribute it. The State responded that this was an appropriate subject area for expert testimony and represented that it would not elicit testimony from him that went to the ultimate issue of guilt.

The trial court denied the in limine motion. It noted our caselaw permits expert testimony on "the appearance of the drugs, the quantity, the purity, the packaging, and the value of the drugs" and that the detective's testimony on these

points would be admissible. The court accepted the State's representation that it would not elicit the expert's testimony on the ultimate issue of guilt, "that the defendant was possessing these drugs with the intent to sell." Thus, the court advised that although the expert could testify about "the packaging, the markings on the packaging, the value of the drugs recovered, and any significance with regards to monetary denominations," it would be for the jury to determine whether his explanation was "sufficient to meet the State's burden."

In his ensuing testimony, the expert stated that low-level street dealers sell "individual doses" of narcotics in small quantities. He said sellers usually communicate with buyers via phone, engaging in "coded conversations" when referencing drugs or money. During these conversations, they would agree on the quantity and the price of drugs and then meet for a brief exchange, usually in a public setting. He said dealers typically employ "runners" to sell drugs for them to avoid detection, and the runners typically receive a cash fee or drugs, depending on the agreement.

The expert provided similar testimony as the lead investigator had given regarding the typical packaging of heroin, stating that: one wax fold (sometimes referred to as a "bag") contains about .1 grams of heroin; ten folds together constitute a "bundle"; five bundles form a "brick"; and five bricks are called a

"sleeve."  Echoing the lead investigator, the expert described how heroin folds typically include a stamp—an insignia, picture, or word—that comes in various designs and colors.  The expert likened the use of stamps as a "marketing technique" so that a user would know the brand of the narcotic and know what to purchase in the future.  Here, the heroin seized from defendant had four distinct stamps.

The expert testified that street users typically do not purchase multiple different stamps of heroin.  As he explained, users will purchase, at most, two stamps, limiting themselves to the brand or dealer that they prefer, "to ensure the quality" of drugs they receive.

The expert related that in Monmouth County, the street price for a single bag of heroin was then between $6 and $10, a bundle was between $50 and $100, and a brick was between $120 and $300.  Thus, he said, 350 bags—the amount found on defendant—amounted to between $2,100 and $3,500 of drugs.  He noted it is cheaper to buy heroin in bulk.  However, he said street users do not usually make bulk purchases because they do not have available cash, and instead purchase "little amounts at a time."

Relatedly, the expert observed that street users typically do not carry large sums of cash on their person.  He said when someone is "deep in [their]

A-2788-22

addiction," they do not have a large amount of cash "stored up," as they usually spend whatever they have to purchase drugs. In contrast, sellers typically carry a lot of cash because that is how they are paid.

The expert noted that average daily heroin use depends on the depth of the user's addiction. When asked on cross examination by defense counsel whether two addicts could ostensibly go through 350 bags of heroin within a few days, depending on their average daily use, the expert agreed that was possible. But, as we will discuss, infra, the expert added a caveat that it would not be true when "coupled with other evidence in the case." He also testified that users generally do not have 350 bags on their person.

The expert reviewed defendant's text messages and defined certain terminology used in those messages. The expert also commented, as noted above, on whether the dollar amounts referenced in the messages were consistent with the price of heroin in Monmouth County.

Defendant objected to the expert's opinions about the text messages, arguing that even if the expert refrained from opining on the ultimate issue, he essentially would be "saying it without saying it." The court recognized this concern but noted the text messages were in evidence, it already had ruled upon

11

the admissibility of the expert's testimony, and noted again the State had agreed it would not elicit "ultimate issue" testimony.

On appeal, defendant contends that portions of the expert's testimony prejudicially exceeded the boundaries mandated by caselaw and prescribed by the trial court. Defendant maintains the admission of those expert opinions is reversible error and mandates a new trial.

The applicable standards of review and legal principles on this issue are well established. A trial court's evidentiary rulings are reviewed under an abuse of discretion standard and will be upheld unless there was "a clear error of judgment." State v. Outland, 458 N.J. Super. 357, 364 (App. Div. 2019). This includes a trial court's determination regarding the qualifications of an expert and the admissibility of opinion. State v. McGuire, 419 N.J. Super. 88, 123 (App. Div. 2011); see also State v. Torres, 183 N.J. 554, 572 (2005). Even if there is a proven abuse of discretion, only errors "that have the clear capacity to cause an unjust result" will warrant reversal of a conviction. State v. Garcia, 245 N.J. 412, 430 (2021). Legal conclusions on such issues are reviewed de novo. State v. Radel, 249 N.J. 469, 493 (2022).

Pursuant to N.J.R.E. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine

12

a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To satisfy this standard, the proponent of expert evidence must establish that: (1) the subject matter of the testimony is "beyond the ken of the average juror"; (2) the field of inquiry is "at a state of the art such that an expert's testimony could be sufficiently reliable"; and (3) the witness has "sufficient expertise" to offer the testimony. State v. J.L.G., 234 N.J. 265, 280 (2018). As we noted, defendant does not contest the expert's qualifications to present such opinions.

Within narcotics cases, our courts have long accepted the use of expert testimony on "the methods employed by drug traffickers to package and to distribute illegal drugs for sale," as "such information is a specialized subject matter that is beyond the ken or normal life experience of the average juror." State v. Reeds, 197 N.J. 280, 290 (2009) (citing State v. Odom, 116 N.J. 65, 76 (1989)). However, "experts may not intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out without expert assistance," nor may experts opine "on the ultimate question of guilt or innocence." State v. McLean, 205 N.J. 438, 461 (2011) (citing Reeds, 197 N.J. at 300; Odom, 116 N.J. at 80).

13

"Whether a defendant possessed a controlled dangerous substance with the intent to distribute is an ultimate issue of fact to be decided by the jury." State v. Cain, 224 N.J. 410, 429 (2016) (emphasis added). "In drug cases, such ultimate-issue testimony may be viewed as an expert's quasi-pronouncement of guilt that intrudes on the exclusive domain of the jury as factfinder and may result in impermissible bolstering of fact witnesses." Id. at 427.

Here, defendant concedes that experts for the State can testify about the cost of drugs, drug packaging, and the function of drug paraphernalia. However, he contends that the State's expert improperly testified about defendant's state of mind when he opined that: (1) street users do not typically buy or carry heroin in bulk; (2) street users do not typically use multiple different stamps of heroin; and (3) dealers typically have large sums of cash on them. We reject these contentions of error.

In Cain, our Supreme Court outlined the various permissible limits of an expert's testimony as it relates to narcotics distributions and transactions. Id. at 426. The allowable scope includes how drugs are packaged and processed, "the significance of the quantities and concentrations of drugs, the value of drugs, [and] the use of identifiable logos on drug packaging." Ibid. (citing Odom, 116 N.J. at 73-75). The Court also recognized in Cain that "[t]here are undoubtedly

14

A-2788-22

other areas where a drug expert can offer needed assistance to a jury." Ibid.; see also State v. Sowell, 213 N.J. 89, 100 (2013) (noting "we do not expect ordinary jurors to understand the difference between drugs possessed for distribution as opposed to personal use").

Applying these principles, the expert's testimony here about the amount of drugs and cash found on defendant and the significance of the different brands falls squarely within the type of testimony that has been deemed admissible by our courts in the past. The three general topics about drug users and drug dealers identified by defendant as unduly prejudicial all fit within the realm of permissible expert opinion.

We applied comparable principles in State v. Patterson, 435 N.J. Super. 498 (App. Div. 2014). There we found no error in a narcotics expert's commenting on a defendant's possession of a large sum of cash—and stating that this was indicative of drug dealing—citing the general admissibility of expert testimony on drug distribution techniques. Id. at 507.

Furthermore, we discern no reversible error arising out of the sole occasion when the expert made a comment directly connecting his expert opinion to defendant's actions. As we noted above, in response to defense counsel's question on cross-examination of whether someone could conceivably

have used 350 bags of heroin for personal use, the expert responded, "yes, not coupled with other evidence in the case, but yes." Defense counsel did not object or move to strike the answer. Instead, counsel responded that he did not want the witness's expert opinion about defendant's case, but his general expert opinion about heroin use. Counsel then modified his earlier question and asked if two individuals who used 140 bags per day could use 420 bags in three days, and the expert responded yes.

Even assuming, for the sake of discussion, this brief testimony selectively extracted from the trial transcripts went beyond the limits of caselaw and the court's pretrial ruling, the expert's opinion was notably prompted by the defense's queries. As such, the testimony, even if deemed improper, constituted "invited error" and does not warrant reversal on appeal. State v. A.R., 213 N.J. 542, 561 (2013). "The doctrine of invited error does not permit a defendant to pursue a strategy of allowing a . . . witness to testify—hopefully to his advantage—and then when the strategy does not work out as planned, cry foul and win a new trial." State v. Williams, 219 N.J. 89, 100 (2014).

Here, defense counsel prompted the opinion by asking whether the specific quantities of drugs found in defendant's room could have been for personal use. The query was not general, but case-specific and tied to the facts

16

and the evidence of 350 bags. Although counsel later clarified that he was not asking the expert to opine about the evidence in this case, his initial question was not so strictly framed. The query opened a door that the State's direct examination had left shut.

We note in this regard the State adhered to its commitment and the court's pretrial ruling and did not elicit this opinion on direct examination. The expert's additional words after saying "yes" in response to defense counsel's query conveyed a legitimate qualification to his affirmative answer. In essence, the expert communicated that the subject was more complicated than might otherwise be inferred from a binary yes/no response. And, as we noted, no request was made of the court to strike the answer and instruct the jury to disregard it. The prosecutor did not refer to that specific answer in his summation.

Moreover, regardless of the invited nature of the claimed error, the doctrine of plain error also applies in the State's favor because defendant did not object to the expert's response. When there is no objection, we must assume "defense counsel did not believe the remarks were prejudicial." State v. Pressley, 232 N.J. 587, 594 (2018). A trial court's error is disregarded on appeal unless it "clearly capable of producing an unjust result." R. 2:10-2. "To

determine whether an alleged error rises to the level of plain error, it must be evaluated in light of the overall strength of the State's case." State v. Singh, 245 N.J. 1, 13 (2021) (internal quotation marks omitted).

In this case, notwithstanding the claimed error in admitting the expert's testimony, there was overwhelming sufficient evidence to support the jury's finding of guilt on the CDS charges. Among other things, that incriminating evidence includes the text messages reflecting that defendant sold drugs to at least three different individuals, defendant's acknowledgment that these text messages reflected drug sales, Best's incriminating testimony, and the evidence collected at the time of defendant's arrest. Any error in the admission of the expert's testimony was manifestly harmless.

In sum, there is no merit to defendant's contentions for reversal based on the State's narcotics expert's testimony.

### B.

We turn to defendant's arguments concerning the jury charge on witness tampering.

When initially reviewing the jury charges with counsel, the trial court stated that it had modeled its proposed witness tampering charge from the Model Jury Charge. The following day, when reviewing the verdict sheet, the State

noted the witness tampering statute had been amended in September 2008, but the witness tampering charge as set forth in the indictment had used the outdated language from the previous version of the statute. The court and counsel all acknowledged that, notwithstanding the outdated language of the indictment, the grand jury properly had been charged pursuant to the current statute.

Consequently, the State moved to amend the indictment pursuant to Rule 3:7-4 to reflect the current language of the witness tampering statute. Over defendant's objection, the court concluded that an amendment of the indictment was appropriate. In so ruling, the court reasoned that the grand jury ultimately had been charged with the correct language from the current statute, defendant had notice of this issue and the changed language, and the amendment to the indictment would result in no prejudice to defendant.

Thereafter, the court charged the jury on witness tampering, as follows:

> In order for you to find defendant guilty of violating the statute, the State must prove beyond a reasonable doubt each and every one of the following elements: 1) That defendant believed an official proceeding or investigation was pending or about to be instituted or has been instituted; 2) That defendant knowingly engaged in conduct which a reasonable person would believe would cause a witness or informant to testify or inform falsely.

This charge was consistent with the Model Jury Charges (Criminal), "Tampering with Witnesses and Informants (N.J.S.A. 2C:28-5a) (Cases arising after September 10, 2008)" (approved Mar. 2009).

The court then reviewed with the jury each element of the offense in detail. In addressing the second factor—that the defendant's conduct must be knowing—the court instructed that "[a] person acts knowingly with respect to the nature of this conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exists, or he is aware of a high probability of their conduct." (Emphasis added). The court added that the State need not prove the existence of knowledge by direct evidence, but the jury could reach this conclusion based on inferences drawn "from the nature of the acts and circumstances surrounding the conduct of the defendant." Defendant did not object to the instruction as given.

On appeal, defendant argues the court's instruction on tampering was improper because it did not instruct the jury on the element of intent: i.e., that defendant could be convicted of witness tampering only if he had intended to cause Best to give false testimony. The instruction's focus on knowledge, defendant argues, omitted this crucial element.

In considering this issue, we are mindful that appropriate and proper jury instructions are essential for a fair trial. State v. Scharf, 225 N.J. 547, 581 (2016). The charge serves as the jurors' legal road map. State v. Martin, 119 N.J. 2, 15 (1990).

Generally, "[a] trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it." State v. Funderburg, 225 N.J. 66, 80 (2016). Reviewing courts should thus consider how jurors would "understand the instructions as a whole," in light of "the evidence before them[] and the circumstances of the trial . . . ." State v. Savage, 172 N.J. 374, 387 (2002).

Further, when, as here, "a party does not object to a jury instruction, [appellate courts] review[] the instruction for plain error." State v. Montalvo, 229 N.J. 300, 320 (2017) (citing R. 1:7-2). When reviewing a jury charge for plain error, the party challenging the instruction must demonstrate "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Id. at 321. "The error must be evaluated 'in light of the

overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

N.J.S.A. 2C:28-5, the current witness tampering statute, provides that a person commits tampering by "knowingly engag[ing] in conduct which a reasonable person would believe would cause a witness or informant to: (1) Testify or inform falsely . . . ." N.J.S.A. 2C:28-5(a). However, whether the trial court's instruction that tracked the words of the statute was constitutionally proper as applied to defendant depends on the application of the Supreme Court's holding in State v. Hill, 256 N.J. 266, 291 (2024), which was issued while this case was pending appeal.

In Hill, the Court addressed whether N.J.S.A. 2C:28-5(a) was unconstitutionally overbroad because it required "only a mens rea of negligence" when, according to Hill, the First Amendment requires "at least a mens rea of recklessness" to criminalize speech under the "true threat" exception. Id. at 278. Hill had sent a letter to the victim—whom he did not know—stating, in part, that he knew she had identified him as the perpetrator of her carjacking. Id. at 274. Hill wrote that if the victim believed without a doubt that he had committed the crime, then she should "disregard this correspondence" but asked her to "[o]therwise please tell the truth if [she was] wrong or not sure 100%." Ibid.

In reviewing the constitutionality of N.J.S.A. 2C:28-5(a), the Court in Hill considered what have been termed the "true threat" and "speech integral to criminal conduct" exceptions to the protections of the First Amendment. Id. at 282. "A true threat is speech that, when taken in context, objectively threatens unlawful violence[,]" whereas "[s]peech integral to criminal conduct is speech that is 'intended to bring about a particular unlawful act.'" Ibid. (quoting United States v. Hansen, 599 U.S. 762, 783 (2023)).

As our Court noted in Hill, "[m]any applications of N.J.S.A. 2C:28-5(a) [are] . . . entirely unrelated to speech." Id. at 285. For "witness tampering prosecutions that do involve speech, garden-variety prosecutions are consistent with the First Amendment and Article I, Paragraph 6 of the New Jersey Constitution because they involve speech that is integral to criminal conduct and is thus unprotected." Id. at 286. Thus, the Court found that N.J.S.A. 2C:28-5 was not facially overbroad and "decline[d] defendant's invitation to construe the 'knowingly' in N.J.S.A. 2C:28-5(a) to apply to both a defendant's conduct and whether the defendant knew that the nature of his conduct would cause a witness to testify falsely." Id. at 289.

That said, the Court in Hill determined that N.J.S.A. 2C:28-5(a) "may have been unconstitutionally applied to" Hill "because he was prosecuted for the

contents of his letter and the jury was not required to find that his letter constituted speech integral to criminal conduct." Ibid. The Court reasoned the letter, by itself, was "not integral to the criminal act of tampering with a witness on its face" because it did not explicitly ask the victim to testify falsely, withhold testimony, elude legal process, absent herself from the proceeding, or otherwise obstruct, delay, or impede an official investigation or proceeding. Id. at 291. Because the letter was "facially innocuous," the Court held that to prove witness tampering based on the contents of the letter, the State must demonstrate that the defendant intended the letter to cause the witness to testify falsely, withhold testimony or information, and so forth. Ibid. Because the jury was not charged on the defendant's intent on this point, the Court vacated his witness tampering conviction and remanded for a new trial. Ibid.

Defendant urges that we apply the principles of Hill to this appeal—which was in the appellate pipeline when the Court's opinion was issued.

The State has not opposed the retroactive application of Hill but argues that case is factually distinguishable. We therefore apply the precedent of Hill to this case. Having done so, we conclude the jury instruction here was constitutionally flawed as applied to defendant by omitting a requirement to

24

prove defendant's intent to tamper with Best's role as an expected witness for the prosecution.

Defendant argues that, as in <u>Hill</u>, the writing in dispute was facially innocuous because it included no threats, demands, or explicit encouragement that Best testify falsely. The pre-filled affidavit reads as follows:

> I recant all of my previous statements made toward Giovanni Pisaniello. I was under mental duress. I was withdrawing from heroin. I only lied because I thought I would be released. I take full responsibility for . . . any and all narcotics found in room 9 at the . . . [m]otel. I apologize for misleading the officers. This is the actual truth. All narcotics found belonged to me.

Even though the affidavit reveals no explicit threat or encouragement, defendant contends the court should have instructed the jury that he could be convicted of witness tampering only if he intended that the affidavit would cause Best to testify or inform falsely.

The State contends that the <u>Hill</u> instruction is inapplicable because "the State's theory was based on defendant's conduct in that he approached Best while both were housed in the Monmouth County jail and slipped Best a form through the access doors in between the pods." We concur that the witness tampering charge was based, in part, on defendant's conduct as alleged by Best. However, it <u>also</u> was based on the <u>contents</u> of the affidavit itself, which Best read into the

record.  It is the use of the content of this writing that triggers the <u>Hill</u> assessment.

We agree that, like in <u>Hill</u>, the pre-filled affidavit here at first blush appears to be facially innocuous.[3]  <u>Id.</u> at 291-92.  From the face of the affidavit, one cannot glean first that it was submitted by defendant and second that it was an attempt to influence Best to testify falsely.  Thus, as in <u>Hill</u>, defendant was "prosecuted for the contents" of a writing without the jury determining whether it constituted "speech integral to criminal conduct."  <u>Id.</u> at 289.  The State's tampering case hinges on evaluating both the speech within the affidavit <u>and</u> the surrounding conduct.  As described by the Court in <u>Hill</u>, if the State intended to prosecute defendant for the act of giving the pre-filled affidavit to Best, it should have introduced a "completely redacted" version of the affidavit, thereby not relying on the contents.  <u>Id.</u> at 291.  If, however, "the prosecution chooses to enter the [document] into evidence and focus on the content of the [document] itself, the jury must be charged that defendant can be found guilty of witness tampering only if he intended his [document] to cause [the recipient] to testify or inform falsely."  <u>Id.</u> at 292.

---

[3]  The affidavit can be read to reflect some worry by Best that he would be in trouble for misleading the police, but that would be indicative of Best's state of mind, not defendant's.

To comply with the free speech protections prescribed by Hill, the jury in this case should have "been required to find that his speech fell into a recognized category of speech unprotected by the First Amendment." Id. at 290. Thus, the court should have instructed the jury that "defendant can be found guilty of witness tampering only if he intended his letter to cause [Best] to testify or inform falsely . . . ." Id. at 292 (emphasis added). Instead, the jury was instructed merely to consider whether "defendant knowingly engaged in conduct which a reasonable person would believe would cause [Best] to testify or inform falsely." (Emphasis added). The state-of-mind differences between intentional (or "purposeful") conduct and knowing conduct are crucial. See e.g., N.J.S.A. 2C:2-2(b)(1) ("A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result."); N.J.S.A. 2C:2-2(b)(2) ("A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence.").

As set forth in Hill, this critical omission of an intent element within the charge was erroneous. The circumstances surrounding the provision of the affidavit to Best within the jail conceivably could support such an inference of

27                                                                    A-2788-22

intent. But it was the jury's responsibility to decide if that inference was proven beyond a reasonable doubt. The jury instruction lacked the guidance necessary under Hill and the Constitution.

This error in the jury instruction on tampering, although not objected to at trial, constituted plain error, because it had the clear capacity to bring about an unjust result. Montalvo, 229 N.J. at 321. Erroneous jury instructions are generally "poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." State v. McKinney, 223 N.J. 475, 495-96 (2015). This is particularly true "when the subject matter is fundamental and essential or is substantially material[,]" in which case the error "is almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013). Indeed, some errors, such as failure to charge an element of an offense, strike so close to the heart of the jury's ability to deliberate as to require presumptive reversal, even absent a timely objection by counsel. State v. Burgess, 298 N.J. Super. 254, 271 (App. Div. 1997), aff'd, 154 N.J. 181 (1998). The flawed instruction here comprises such an error.

We do not regard the evidence here to be "so clear as to have compelled a jury, if properly instructed as to the definitional elements of the offense, to return a guilty verdict." Ibid. Conceivably, a jury could have concluded that defendant

reasonably knew that approaching Best with a pre-filled affidavit—which, by defendant's own testimony, contained false assertions—could influence Best to provide false information (as the jury found), but that this same evidence was insufficient to establish defendant's specific intent to bring about that result. Best did not testify about any specific statement from defendant elucidating his intent; rather it was to be inferred based on defendant's purported conduct and the content of the affidavit. Whether the jury would have reached this conclusion is unknown, and "where the penalty is so severe, it is inappropriate for the court to speculate on what a jury, properly instructed, would have done except in the clearest case." Ibid. Indeed, the "question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury . . . ." Ibid. (quoting State v. Schmidt, 110 N.J. 258, 265 (1988)).

Consequently, because the jury was not correctly instructed on the element of defendant's intent, defendant's witness-tampering conviction "must be vacated to ensure that the statute is constitutionally applied to him." Hill, 256 N.J. at 291. Therefore, we reverse defendant's witness tampering conviction and remand for retrial on that count.

## III.

Because we have vacated defendant's witness tampering conviction, which comprised three years of his aggregate ten-year sentence, we are not obligated to address defendant's argument that his sentence is excessive. We nonetheless remand the case for resentencing, regardless of whether the State chooses to retry the tampering count, to enable the "overall fairness" of the sentence to be reexamined. State v. Torres, 246 N.J. 246, 268 (2021).

## IV.

To the extent we have not addressed them, any remaining points defendant raises on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-2788-22